RUTH M. HARRINGTON *et al* Appellants, *vs.* BOARD OF ALDERMEN OF THE CITY OF PROVIDENCE.

PROVIDENCE — AUGUST 2, 1897.

PRESENT: Matteson, C. J., Stiness, Tillinghast, Rogers and Douglas, JJ.

A statute "in the interest of the public health," authorized the board of aldermen of the city of Providence to compel the owner or occupant of land abutting on any street in the city in which there is a sewer to connect the drainage of said land with the sewer; and also empowered the board to direct the owner or occupant to fill up and destroy any privy vault, &c., on said land. Penalties were prescribed for non-compliance with such orders and directions, and, if the non-compliance continued, the board was further authorized to cause the filling up to be done. The statute contained no provision for notice to or hearing of the owner or occupant before issuing the order or direction :—

*Held*, that the statute is a proper exercise of the police power, and is, therefore, constitutional.

The statute further provided that the pendency of any appeal from such order or direction should not affect the power of the board of aldermen to proceed with the filling up as authorized :—

*Held*, that this provision is not in any way in contravention of the constitution.

Under its police power the legislature can declare that certain things are nuisances *per se*; and privy vaults, as described in the statute, are embraced in such things.

Under the same power, summary action, without a hearing, without previous jury trial, and without compensation, may be constitutional.

Although no notice of the intention to issue the order or direction be necessary, yet in a suit by the city for the penalty, or in an action by the owner for the

supposed trespass in destroying the vault, he will have his day in court, and a
right to trial by jury, and proof will then have to be adduced that the alleged
nuisance was in fact a privy vault, and unauthorized under the statute.

APPEAL from an order of the board of aldermen of the city
of Providence requiring appellant to connect her land in the
city with the public sewer, and also requiring her to fill up
and destroy all receptacles for drainage and sewage on said
land.

The Common Pleas Division ruled in favor of the constitu-
tionality of the statute under which the order was made,
and, upon certain admissions of appellant, directed a verdict
confirming said order.    Heard on the constitutional question
raised.

ROGERS, J. The sole question in this case before the court
at this time is as to the constitutionality of Pub. Laws R. I.
cap. 777, of April 25, 1889, as amended by cap. 1407 of March
1, 1895, and which act as amended is as follows :

"SECTION 1.    The board of aldermen of the city of Provi-
dence may compel any abutting owner or occupant of land
upon any street in said city in which there is a sewer to con-
nect the drainage of his land and premises with such sewer,
and may direct said owner or occupant to fill up and destroy
any cess-pool, privy vault, or other arrangement for the re-
ception of drainage.

SEC. 2.    Upon the service of any order or direction or a
copy thereof upon any owner or occupant of such land to
connect the drainage as aforesaid, or to fill up or destroy any
cess-pool, privy vault, or other arrangement for the reception
of drainage, such owner or occupant shall comply with such
order or direction within ten days from the time of service
of such order.

SEC. 3.    In case the owner or occupant to whom such or-
der shall be directed shall neglect or refuse to comply there-
with within ten days after the service thereof upon him, such
owner or occupant shall be fined not less than five nor more
than twenty dollars for each subsequent twenty-four hours
during which he shall neglect or refuse to comply therewith,

and in case such neglect or refusal shall continue for sixty days after the service of said order, said board of aldermen may cause any cess-pool, privy vault, or other arrangement for the reception of drainage upon the land of such owner or occupant, to be filled up and destroyed, and the pendency of any appeal from any of such orders or doings of said board shall not affect the power of said board after the expiration of said period of sixty days to cause the same to be forthwith filled up and destroyed, the aforegoing provisions being in the interest of the public health of said city.

SEC. 4.   This act shall take effect from and after its passage, and all acts and parts of acts inconsistent herewith are hereby repealed."

On August 1st, 1895, the board of aldermen of the city of Providence passed the following resolution :

"*Resolved*, That Ruth M. Harrington, wife of Wm. W., be and she is hereby ordered to connect the drainage of the land and premises situated on West Clifford street in this city, bounded and described as follows : . . . . . . with the sewer in said West Clifford street, and that the said Ruth M. Harrington be and she hereby is directed to fill up and destroy any and all cess-pools, privy vaults, or other arrangements for the reception of drainage on said premises, the said Ruth M. Harrington being the owner, occupant of said premises, within ten days from the time of service of this order or of a copy thereof upon said Ruth M. Harrington."

August 3d, 1895, a copy of said resolution or order was duly served upon Mrs. Harrington, and an appeal from said proceedings of the board of aldermen having been taken by Mr. and Mrs. Harrington, for both husband and wife joined in the appeal, and a claim for jury trial having been made, trial was had before the Common Pleas Division, in which, upon the admissions of the appellants, a verdict was directed by the court ratifying and confirming the said order of the board of aldermen.   At the jury trial it was admitted and agreed that Mrs. Harrington was the owner of the premises described, that there was a privy vault used for the reception of human excrement upon said premises, that West Clif-

ford street was a sewered street, that said board of aldermen passed said order August 1, 1895, that said order was duly served on Mrs. Harrington, August 3, 1895, and that before the making of said order Mrs. Harrington had no notice to appear before the board of aldermen and show cause why said order should not be made against her in the premises, nor any opportunity for a hearing. The appellants claimed that said cap. 777, as amended by cap. 1407 of the Pub. Laws, was unconstitutional. They also claimed that although there was a privy vault on said premises used for the reception of human excrement, yet it was not used for the reception of drainage in the sense in which they claimed the word was intended in the statute, and they offered to prove that on August 1, 1895, and long prior thereto, said privy vault was not kept and maintained as a nuisance, but was kept in good order and condition, and so as not to be prejudicial to the public health; and also that the drainage of said premises was on and before August 1, 1895, and ever since, connected with the sewer on West Clifford street; the broad claim of the appellants being the right to put in evidence to the jury as to the condition of that privy vault and of the premises and surroundings, in order that the jury might determine (as it was contended that it should determine) that an order of the kind aforesaid should not be passed against the said Ruth M. Harrington. The presiding justice ruled said statute constitutional as required by law, ruled out the evidence offered by the appellants, and directed the jury, upon the admissions made, to find a verdict ratifying and confirming the said order; whereupon the constitutional question was duly certified to the Appellate Division for determination, and appellants petitioned for a new trial for the alleged misrulings upon the evidence and upon ordering the verdict; but the question now before this Division, as stated above, is solely upon the constitutionality of said statute, the whole travel of the case in the Common Pleas Division having been given merely to elucidate the constitutional aspect of it.

The appellants claim that cap. 777 of the Public Laws and cap. 1407 in amendment thereof are unconstitutional because

no provision is made for notice to the owner or occupant of premises, and no opportunity for hearing thereon is given to the owner or occupant before the passage of the order or direction by the board of aldermen, and because, also by the provisions of Sec. 3, as amended, the pendency of an appeal will not affect the power of the board to fill up and destroy the privy vault of such owner or occupant of the premises.

This statute, "being in the interest of the public health of said city"—to, quote the concluding words of § 3 of it—is clearly intended to be an exercise of what is called *the police power*, and if it is a proper exercise of such power, both as to subject matter and as to methods, then its constitutionality cannot be successfully impugned.

"Rights of property," says Chief Justice Shaw, in *Commonweath v. Alger*, 7 Cush. 53, 85, "like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and limitations established by law as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient. This is very different from the right of eminent domain, the right of a government to take and appropriate private property to public use, whenever the public exigency requires it ; which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power, the power vested in the legislature by the constitution, to make, ordain, and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. . . . . . . Nor does the prohibition of such noxious use of property, a prohibition imposed because such use would be injurious to the public, although it may diminish the profit of the owner, make it an appropriation to the public use, so as to entitle the owner to compensation. . . . . If a landlord could let his building for a small-pox hospital, or a slaughter-house, he might obtain

an increased rent. But he is restrained ; not because the public have occasion to make the like use, or to make any use of the property, or to take any benefit or profit to themselves from it ; but because it would be a noxious use, contrary to the maxim, *sic utere tuo ut alienum non lœdas.* It is not an appropriation of the property to a public use, but the restraint of an injurious private use by the owner, and is therefore not within the principle of property taken under the right of eminent domain."

In the words of Mr. Justice Harlan, in the *Slaughter House Cases,* 14 Wall. 36, 62, "This power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property."

Chief Justice Redfield, in *Thorpe* v. *Rutland & Burlington R. R. Co.,* 27 Vt. 140, 149, 150, uses this language : "The police power of the state extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the state ; . . . . . and persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health and prosperity of the state ; of the perfect right in the legislature to do which no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned."

To quote Mr. Justice Harlan again, and this time in *Powell* v. *Pennsylvania,* 127 U. S. 678, 685, "The power which the legislature has to promote the general welfare is very great, and the discretion which that department of the government has, in the employment of means to that end, is very large."

"Police regulations," says Mr. Justice Wilde, in *Baker* v. *City of Boston,* 12 Pick. 184, 193, "to direct the use of private property so as to prevent its proving pernicious to the citizens at large, are not void, although they may in some measure interfere with private rights without providing for compensation : . . . . if by such regulations an indi-

vidual receives some damage, it is considered as *damnum absque injuria*. The law presumes he is compensated by sharing in the advantages arising from such beneficial regulations."

In regard to a Massachusetts statute authorizing the city council of Boston to raise the grade of certain lands, in order to secure a complete drainage thereof, Mr. Justice Morton, in *Nickerson* v. *City of Boston*, 131 Mass. 306, 308, said : "It belongs to that class of police regulations to which private rights are held subject, and is founded upon the right of the public to protect itself from nuisances, and to preserve the general health. The authority of the legislature to pass laws of this character is too well settled to be questioned." See also *Commonwealth* v. *Roberts*, 155 Mass. 281.

Unwholesome trades, slaughter-houses, operations offensive to the senses, the burial of the dead, drainage, the deposit of powder, and the building with combustible materials, in thickly settled communities, are some of the numerous matters to which the police power has been applied, but the list is too long to make an attempt at enumeration practicable. See 18 Am. & Eng. Encyc. L. 748 ; 2 Kent's Com. * 340 ; Cooley's Con. Lim. 712 *et post*.

Is the subject matter of said cap. 777, as amended by cap. 1407, Pub. Laws R. I., a proper one for the constitutional use of the police power ? And by this we mean not merely the regulation of the *use* of privy vaults, cess-pools, and other arrangements for the reception of drainage, but the absolute abatement of them under certain conditions regardless of the manner in which they may chance to be kept. It is sufficient for us in this inquiry to consider privy vaults alone, as it is agreed on all hands that it was a privy vault only that was, as a matter of fact, obnoxious to the statute in the case at bar, and that, too, one used solely for the reception of human excrement, for a statute may be unconstitutional in part and constitutional in part ; and while the unconstitutional part may be void, the constitutional part may be valid and may be carried into effect, the test in such cases being whether the parts are so interwoven and interde-

pendent that they can stand only as a whole. *State* v. *Clark* 15 R. I. 383 ; *State* v. *Tonks,* 15 R. I. 385 ; *In re the Constitutional Amendment,* 16 R. I. 754, 758.

The receptacles known as privy vaults, for what might not inaptly be called the drainage of the human body, viz., human excrement, have in thickly settled communities been a very common matter for the exercise of the police power. It is common knowledge that the condition in which they shall be kept when allowed to exist, their construction, their locality, the time and manner of removing their contents, have, especially in cities, been subjected to sharp police regulation. Few things are more disagreeable to the senses or more injurious to health than the noisome smells too .frequently arising from them. Their very presence is a menace to comfort and health, and a source of apprehension to the neighborhood. The best that can be done so long as they exist is to reduce the dangers within them to the minimum, and which, if vigilance be relaxed, soon loom up to the maximum. Wood, in his treatise on Nuisances, § 579, says that privies are regarded as *prima facie* nuisances ; and the same words are used by the court in *Wahle* v. *Reinbach,* 76 Ill. 322, 326. In *Commonwealth* v. *Roberts,* 155 Mass. 281, 282, which involved the constitutionality of a statute providing under a penalty that certain buildings in Boston, "situated on a public or private street, court, or passageway, in which there is a public sewer, and every building connecting with any sewer, shall have sufficient water-closets connected with the sewer, and shall not have a cess-pool or privy, except where in the opinion of the board of health it can be allowed to remain temporarily, and then only as said board shall approve," Mr. Justice Lathrop, in delivering the opinion of the court, said : "There can be no doubt that the statute in question is within the constitutional powers of the legislature as a police regulation. It is an act for the preservation of the public health, and relates to the disposal of one of the most dangerous forms of sewage."

But it is contended on the part of the appellants that the privy vault itself, when properly used, is neither a nuisance

nor injurious to health or comfort; that it only becomes so when not properly cared for, and therefore that its abuse, or improper use, alone makes it subject to police regulation and repression. The storage of gunpowder, the existence of buildings of such character and condition as to make them liable to catch fire, in thickly settled neighborhoods, have frequently been the subject of police regulation and repression, but neither would do any actual harm until carelessness, accident, or some unforeseen agency set them on fire, an event that might never happen; and yet the menace and the apprehension caused by their presence have been frequently deemed sufficient to justify their removal under the police power.

The exercise of human power, to be reasonable, must always be within reasonable human limitations. It is one of the laws of human nature that there shall be from time to time rejections from our persons of unassimilated matter, and this higher law must be recognized in judging of the reasonableness of any human legislation in any wise pertaining to it; hence the necessity of some sort of provision for these rejections is always recognized by legislatures and courts. The crudest and most objectionable provision for them in civilized countries is presented by a great army in the field in time of war; while the most perfect and least objectionable provision for them is afforded in those towns and cities possessing the best water and sewage systems, thus making possible what are called the modern conveniences. It is common knowledge that the city of Providence has expended vast sums of money in perfecting its water and sewer systems, thus making possible what was before impossible, in the way of eliminating the menace presented and the apprehension aroused by the existence of privy vaults; and the statute in question operates merely to remove an objectionable receptacle where an opportunity exists of supplying a means of getting rid of the objectionable matter. It operates to repress privy vaults under reasonable limitations, for the land on which the privy vault to be repressed was situated must abut upon a street in which there was a sewer. Then, if there was no connection with the sewer from that land,

ten days after notice given was allowed to make the proper connections and comply with the statute.    Then, if the owner or occupant neglected or refused to comply, a penalty of not less than five nor more than twenty dollars for each subsequent twenty-four hours during which he should neglect or refuse to comply therewith was imposed ; and if this accumulating penalty, this milder means, failed of accomplishing the result, then the board of aldermen, as a last resort, could cause the privy vault to be filled up and destroyed.    The pressure of power was applied at first very moderately and free from harshness, gradually increasing, until it might well be claimed that the fear of a money penalty would not repress the evil, and only culminating at last in the actual repression by the board when the owner or occupant had neglected or refused to act.

Is notice to the owner or occupant before the passage of the order by the board of aldermen, under the statute in question, constitutionally necessary, or is it requisite that he should have what is called *his day in court*, or a trial by jury, before the passage of said order, or before the privy vault can be filled up and destroyed ?

Senator Edmonds, in *Hart* v. *Mayor, &c., of Albany*, 9 Wend. 571, 609, says :  " Much stress was laid by the counsel for the appellants upon the fact that the exercise of the right claimed by the respondents would result in the destruction of their property, without the benefit of a trial by jury, and that consequently the ordinance in question was a violation of the constitution and the bill of rights.    The same objection would apply to the dejection of every nuisance, yet nothing is clearer or better settled than the right to exercise this power in a summary manner, not only where the whole community is affected, but where a private individual alone is injured.    It is a right necessary to the good order of society, and the reason why the law allows this private and summary method of doing one's self justice is because injuries of this kind, which obstruct or annoy such things as are of daily convenience and use, require an immediate remedy, and cannot wait for the slow progress of the ordinary forms of justice."

In *King et al.* v. *Davenport, Ex'r*, 98 Ill. 305, the question was as to the validity of an ordinance of the city of Jacksonville, which city had been empowered to pass the same, to establish fire limits and to declare the building or repairing of buildings with combustible materials within the fire limits a nuisance, and to provide against the erection of buildings, roofs or cornices with other than fire proof material within said fire limits, and which provided that if the offender, upon reasonable notice, failed to remove such wooden building, or wooden part of such building, the city marshal, upon the written direction of the mayor, should remove or tear down such building, or such part thereof as may be necessary. The ordinance further provided that the offender should be subject to a fine of $100 for each week he failed to remove such wooden building, or wooden part thereof, and that, if the city caused the removal, the expense of the removal might be recovered of the offender. The plaintiff's testatrix violated this ordinance by taking off an old and out of repair shingle roof from her building, situated within the fire limits, and putting thereon, without permission, a new shingle roof. She failed to remove the new roof upon due notice, and, the same having been removed by the city marshal in conformity with the ordinance, she brought an action of trespass against the mayor and marshal of the city for the removing of the roof, and dying since the bringing of the action her executor was substituted as plaintiff. The defendants justified under the ordinance, and the sole question was as to the validity of the ordinance. The court in its opinion said, *inter alia*, p. 314 *et post:* "There can be no doubt, it seems to us, that the ordinance in question was a police regulation, proper, and made in good faith, 'for the purpose of guarding against the calamities of fire,' in a populous neighborhood, and we must regard it as an entirely reasonable regulation. There is no more frequent or admittedly proper exercise of the police power, than that of the prohibition of the erection of buildings of combustible materials in the populous part of a town, and the only means of making such prohibition effectual is by summary abatement. Every moment's delay in the removal

of the nuisance is constant exposure to danger. Before any judicial inquiry and hearing could be had in the matter, the whole evil sought to be guarded against might be produced. The imposition of a penalty would but punish the offender, it would not remove the source of danger. This latter is the thing which the necessity of the case requires, and immediate abatement is the only competent remedy."

The *City of Salem* v. *Eastern R. R. Co.*, 98 Mass. 431, was an action to recover money expended from the city treasury by its board of health to remove a nuisance, which removal, being the digging of a canal for the abatement of a nuisance in a mill pond, was made under an ordinance of the city authorized by a statute of the State. Mr. Justice Wells, in delivering the opinion of the court, on p. 442 *et post*, used this language : " The proceedings of the board of health are said to be defective, because taken without previous notice to the defendants and opportunity to be heard. The evidence tended to show that the defendants were notified of the pendency of proceedings, and of the action taken by the board of health from time to time ; but there was no such notice beforehand as would give the defendants an opportunity to appear and be heard upon the contemplated action of the board ; and there was no hearing upon any of the questions before them. The statute does not require any previous notice. Notice must be given of general regulations prescribed by the board of health under §§ 5 and 6, before parties can be held in fault for a disregard of their requirements. But, although such general regulations may seriously interfere with the enjoyment of private property, and disturb the exercise of valuable private rights, no previous notice to parties so to be affected by them is necessary to their validity. They belong to that class of police regulations to which all individual rights of property are held subject, whether established directly by enactments of the legislative power, or by its authority through boards of local administration." After citing various cases, and enlarging upon the reasons for notice not being required, viz., the necessity for summary action, the fact that delay for hearing the

parties might defeat all beneficial results from an attempt to exercise the power conferred upon boards of health, etc., the learned judge concluded on this point as follows, p. 444 : "The necessity of the case, and the importance of the public interests at stake, justify the omission of notice to the individual. When the statute authorizing the proceedings requires no notice, their validity without notice is not to be determined by the apparent propriety of giving notice in the particular case, but by considerations affecting the whole range of cases to which the statute was intended to apply."

In *Blair et al.* v. *Forehand*, 100 Mass. 136, 139, where the question was as to the validity of a statute authorizing the summary killing of unlicensed dogs, Mr. Justice Gray said : "All rights of property are held subject to such reasonable control and regulation of the mode of keeping and use as the legislature, under the police power vested in them by the constitution of the commonwealth, may think necessary for the preventing of injuries to the rights of others, and the security of the public health and welfare. In the exercise of this power, the legislature may not only provide that certain kinds of property (either absolutely, or when held in such a manner or under such circumstances as to be injurious, dangerous or noxious) may be seized and confiscated upon legal process after notice and hearing ; but may also, when necessary to insure the public safety, authorize them to be summarily destroyed by the municipal authorities without previous notice to the owner — as in the familiar cases of pulling down buildings to prevent the spreading of a conflagration or the impending fall of the buildings themselves, throwing overboard decaying or infected food, or abating other nuisances dangerous to health ;" citing various authorities in support thereof.

In the celebrated Trinity Church case, *Health Department* v. *Rector, etc.*, 145 N. Y. 32, 47, Mr. Justice Peckham gave expression to this *obiter dictum :* "This is not the case of a proceeding against an individual on the ground of the maintenance of a nuisance by him, nor is it the case of an assumed right to destroy an alleged nuisance without any other proof

than the decision of the board itself (with or without a hearing) that the thing condemned was a nuisance. Nor is it the case of the destruction of property which is in fact a nuisance, without compensation. Where property of an individual is to be condemned and abated as a nuisance it must be that somewhere between the institution of the proceedings and the final result the owner shall be heard in the courts upon that question, or else that he shall have an opportunity when calling upon those persons who destroyed his property to account for the same, to show that the alleged nuisance was not one in fact. No decision of a board of health, even if made on a hearing, can conclude the owner upon the question of nuisance."

Mr. Justice Peckham's *dictum*, just quoted, is claimed by both appellants and appellees in this case as favoring their respective contentions, but, rightly understood, it would seem, beyond peradventure, to favor the appellees. The case of *Miller* v. *Horton et al.*, 152 Mass. 540, affords an apt illustration of Mr. Justice Peckham's meaning. This was tort for the summary killing of a horse that had been adjudged by the Commissioners on Contagious Diseases among Domestic Animals, under Statute of 1887, cap. 252, to have the contagious disease known as glanders, or farcy, and for the killing of which an order had been issued by them, with no provision for compensation to the owner. The defendants admitted the killing but justified that they did it in obedience to the order. The court below ruled the act to be constitutional, found that the horse killed was not afflicted with glanders, or any contagious disease, and found for the defendant, *i. e.*, that the justification was sufficient. The whole of the Supreme Judicial Court assumed the statute to be constitutional, a difference arising only as to whether, if the horse did not have the glanders as a matter of fact, the killing was justifiable under the order. The court stood four to three, the majority deciding that the killing was not justified, and the minority that it was justified under the order. Holmes, J., in giving the opinion of the majority of the court, said, *inter alia :* "The language of the material part

of § 13 of the act of 1887 is : 'In all cases of farcy or glanders, the commissioners, having condemned the animal infected therewith, shall cause such animal to be killed without an appraisal, but may pay the owner or any other person an equitable sum for the killing and burial thereof.' Taken literally, these words only give the commissioners jurisdiction and power to condemn a horse that really has the glanders. The question is whether they go further by implication, so that, if a horse which has not the disease is condemned by the commissioners, their order will protect the man who kills it in a subsequent suit by the owner for compensation. . . . . When, as here, the horse is not only not to be paid for, but may be condemned without appeal and killed without giving the owner a hearing or even notice, the grounds are very strong for believing that the statute means no more than it says, and is intended to authorize the killing of actually infected horses only. . . . . Section 13 of the act of 1887, by implication, declares horses with the glanders to be nuisances, and we assume in favor of the defendant that it may do so constitutionally, and may authorize them to be killed without compensation to the owners. But the statute does not declare all horses to be nuisances, and the question is whether, if the owner of the horse denies that his horse falls within the class declared to be so, the legislature can make the *ex parte* decision of a board like this conclusive upon him. That question is answered by the decision in *Fisher* v. *McGirr*, 1 Gray, 1. It is decided there that the owner has a right to be heard, and, further, that only a trial by jury satisfies the provision of Article XII of the Declaration of Rights, that no subject shall be deprived of his property but by the judgment of his peers, or the law of the land. . . . . Of course there cannot be a trial by jury before killing an animal supposed to have a contagious disease, and we assume that the legislature may authorize its destruction in such emergencies without a hearing beforehand. But it does not follow that it can throw the loss on the owner without a hearing. If he cannot be heard beforehand, he may be heard afterward. The statute may provide

for paying him in case it should appear that his property was not what the legislature has declared to be a nuisance, and may give him his hearing in that way. If it does not do so, the statute may leave those who act under it to proceed at their peril, and the owner gets his hearing in an action against them."

There are many other cases which might be cited in reference to the non-necessity of notice before the passage of the order, but the foregoing are sufficient to satisfy us that no such notice is required. When the appellant is sued for the penalty she will have her day in court and a trial by jury if she desires, and proof will have to be adduced to show that she had an unauthorized privy vault upon her premises to obtain a recovery against her. So if an alleged privy vault upon her premises is filled up and destroyed under alleged authority of said cap. 777 as amended by cap. 1407, she can bring suit against the persons doing the act for the supposed trespass, and when they attempt to justify under the statute she will have her day in court and a trial by jury if she desires, and the defendants will have to show that the alleged privy vault was actually a privy vault, and that it was unauthorized under the statute.

Of course if the thing declared by statute to be a nuisance, or the thing regulated or repressed under an exercise of the police power, is not a nuisance in fact, or within the province of the exercise of the police power, then the court will declare the statute unconstitutional, for the power is not to be used under the mere allegation, color, or pretence of being a proper exercise of the police power when in truth it is not. But the legislature, as we have already seen, is to a great extent the proper judge of the necessity for the exercise of this restraining power. In addition to cases already quoted from, see *Watertown* v. *Mayo*, 109 Mass. 315, 319 ; *Train* v. *Boston Disinfecting Co.*, 144 Mass. 523, 530 ; in which latter case Devens, J., said : "But there can be no doubt of the right of the legislature to pronounce, under its police power, certain things or certain acts nuisances in themselves."

The appellant urges, as a ground for adjudging the act in

question unconstitutional, that she cannot be heard upon the question whether the privy vault upon her premises is a nuisance or not, irrespective of the legislative determination thereof.    We have already seen that the legislature can pronounce under its police power that certain things are nuisances *per se*, and privy vaults, under the conditions provided for in said cap. 777 as amended by cap. 1407, are embraced in such things.    The legislature is authorized under its police power to determine and enact that places used for the illegal sale of intoxicating liquors are nuisances, and persons prosecuted thereunder can show that the place complained of is not used for the sale of intoxicating liquors, but they are not permitted to show that although the place is used for the illegal sale of intoxicating liquors yet that it is not a nuisance. That was determined by the legislature when it passed the act, as to the propriety of the passage of which the persons prosecuted doubtless had no notice or hearing; neither are such persons entitled to be heard whether proceedings shall be commenced against them.    So the legislature has made a statute as to a certain class of privy vaults, and the appellant can have an opportunity of being heard whether her privy vault is of that class; but she will not be heard as to whether her privy vault would not have been a nuisance if the act had not been passed, because she was not heard upon the question whether the legislature should pass such a law, nor whether the board of aldermen should have initiated proceedings against her by giving her a preliminary notice or order.

·The appellants contend that privy vaults have never been declared by statute nuisances *per se*.    We do not understand that a formal declaration that a thing is a nuisance, *ipsissimis verbis*, is necessary to bring it within the exercise of the police power, or to constitute it a nuisance.    A formal declaration that a thing is a nuisance does not necessarily make it so, as we have already seen ; and not formally declaring it to be a nuisance does not technically keep it from being one, if it is treated as such in the statute.    Thus we have seen that Mr. Justice Holmes, in *Miller* v. *Horton et al.*, *supra*, said, *inter alia*, "Section 13 of the act of 1887, by im-

plication, declares horses with the glanders to be nuisances;" and yet reference to that section shows that such horses were not called nuisances, but only treated as such ; nor is the word *nuisance* anywhere to be found in the whole act.    Cap. 777 as amended by Cap. 1407 distinctly declares, at the end of the act, that its provisions were made " in the interest of the public health of the city," and that is all sufficient, coupled with the nature of its provisions.

Neither do we see that the provision of the statute in question, referring to the filling up and destroying privy vaults, etc., notwithstanding the pendency of an appeal, was in any way in contravention of the constitution.    We have already referred to various authorities that summary action under the police power without being heard, without previous jury trial, and without compensation, might be constitutional. Under our system an appeal is allowed from any order of a town council, but as the law stood in August, 1895, it was at least sixty-five days from the date of the passage of the order before it could be called in the Appellate Court for assignment even, Jud. Act, 132, and so to avoid all question as to the effect of an appeal from an order under said caps. 777 and 1407, under the general provisions as to such appeals, it was plainly declared that such an appeal should not prevent summary proceedings under said chapters.    The appeal was not affected by the abatement of the nuisance any more than trial by jury was affected by such abatement, although the prosecution of the appeal, like the trial by jury, followed the abatement.

The appellants seem to draw a distinction between the privy vaults mentioned in said caps. 777 and 1407 on the one hand, and the cess-pools and other arrangements for the reception of drainage on the other, that is not altogether apparent to us ; but inasmuch as such distinction is sought to be drawn, and as a privy vault is alone involved in this suit, our decision is limited to the constitutionality of the statute in question so far only as it refers to privy vaults mentioned therein.

In conclusion we are of the opinion that cap. 777, of April

25, 1889, as amended by cap. 1407, of March 1, 1895, so far as it relates to privy vaults, being the only portion called in question in this case, is not in violation of the constitution.

*Henry J. Spooner, Stephen A. Cooke and Louis L. Angell,* for appellants.

*Francis Colwell and Albert A. Baker,* for appellees.