Sebastian **MILARDO**

v.

**COASTAL RESOURCES MANAGE-
MENT COUNCIL OF RHODE
ISLAND et al.**

**No. 79–245–M.P.**

Supreme Court of Rhode Island.

Sept. 1, 1981.

Hogan & Hogan, Thomas S. Hogan, Donald J. Packer, Providence, for plaintiff.

Dennis H. Esposito, Providence, for defendants.

## OPINION

WEISBERGER, Justice.

The plaintiff, Sebastian Milardo, owns a piece of property abutting Winnapaug Pond in Westerly, Rhode Island. Having decided to develop the property for construction of a summer home, the plaintiff sought a variance from the Rhode Island Department of Health regulations regarding sewage disposal. In essence, the plaintiff proposed to minimize the introduction of waste materials into the surrounding marsh ecosystem by installing an Individual Sewage Disposal System (ISDS). The ISDS had been specifically designed for the property by Joseph Frisella, a civil engineer.

The plaintiff's application to the Department of Health resulted in conditional approval on April 17, 1975. The conditions imposed included, inter alia, the following:

"h. A copy of this approval must be submitted to the Coastal Resources Board for [its] concurrence.

"i. The continued use of such system as aforesaid shall not contaminate any drinking water supply or tributary thereto; shall not pollute or cause high nutrient levels in any body of water; shall not interfere with the public use and enjoyment of any recreational resource; shall not create a public or private nuisance; shall not be a danger to the public health."

Thereafter, plaintiff appeared before a subcommittee of defendant, the Coastal Resources Management Council (the council) in Westerly, Rhode Island on August 26, 1975. This subcommittee reported to the full council at its regular meeting on Octo-

ber 12, 1976, in Providence, recommending that the application be denied. The full council received the record of the August 1975 subcommittee meeting. In addition, the full council heard evidence and questioned witnesses.

The full council initially rendered a decision to the effect that because the approval of the Health Department was not final, the matter was not properly before the council. Subsequently, however, the council issued a final decision denying plaintiff's petition on substantive grounds. On the basis of testimony at the October 1976 hearing, the council concluded, inter alia, that installation of plaintiff's ISDS in this barrier-beach region would result in the "introduction of nitrogens, nitrants, [sic] and phosphates into the marsh in significant amounts." In addition, the council found a significant probability of damage to the hydrology and biology of the barrier wetland. Accordingly, the council refused to concur with the Department of Health's conditional approval, and plaintiff's application was denied.

The plaintiff appealed to the Superior Court, pursuant to the Administrative Procedures Act, G.L. 1956 (1977 Reenactment) § 42–35–15. The Superior Court justice denied and dismissed plaintiff's appeal and affirmed the council's decision, whereupon plaintiff sought further review by appeal to this court. Section 42–35–16, however, states that a party seeking Supreme Court review must do so by petition for certiorari. On March 20, 1980, this court, recognizing that appeal was an inappropriate procedure, entered an order directing plaintiff to appear and show cause why his appeal should not be dismissed. *Milardo v. Coastal Resources Management Council*, R.I., 413 A.2d 115 (1980). Following oral argument on this issue in May 1980, we concluded that the constitutional issues raised were of sufficient importance that dismissal would be inappropriate. Accordingly, on June 24, 1980, we issued an order to the effect that the appeal would be treated as a statutory petition for certiorari, which petition we granted. *Milardo v. Coastal Resources Management Council*, R.I., 419 A.2d 312

(1980). The writ was issued on July 3, 1980, and the case came on for argument on the merits in May 1981.

The plaintiff raises nine issues for our consideration. Essentially, however, these issues revolve around three pivotal elements: (1) the power of the state to regulate the use of his property; (2) the validity of the delegation of this power to the council; and (3) the exercise of this power by the council in the instant case.

I

The plaintiff contends that the denial of his application amounts to a "taking" of his property such that he should be compensated for his economic loss. In essence he is arguing that the public at large should bear the economic burden for this exercise of state power. *See Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980). The Superior Court justice rejected this argument. The only evidence in the record concerning this issue was the testimony before the council of a local real estate appraiser, who stated that if the land was determined to be not buildable, it would have "no value whatsoever outside of beauty in the eyes of the beholder." This rather sweeping conclusion does not purport to take into account other possible uses to which the land might be put or, indeed, the possibility that a more effective sewage-disposal system might be devised.

 This court has recognized that a regulation depriving an owner of all beneficial use of his property is confiscatory and requires compensation. *Sundlun v. Zoning Board of Review*, 50 R.I. 108, 145 A. 451 (1929). When use regulations are reasonably necessary to protect the public health and safety, however, we have considered them permissible exercises of the police power which did not require compensation. *Holgate v. Zoning Board of Review*, 74 R.I. 333, 60 A.2d 732 (1948); *Horton v. Old Colony Bill Posting Co.*, 36 R.I. 507, 90 A. 822 (1914); *Harrington v. Board of Aldermen*, 20 R.I. 233, 38 A. 1 (1897); *see Sundlun v. Zoning Board of Review, supra.*

The power of the state to regulate for the protection of public health, safety, and morals, also known as the police power, is not a static concept. As advances in scientific knowledge have increased public awareness of certain harms, the power of society to guard against these newly perceived dangers must adjust accordingly. *Candlestick Properties, Inc. v. San Francisco Bay Conservation & Development Commission*, 11 Cal.App.3d 557, 571 89 Cal.Rptr. 897, 905 (1970). Activities that have previously been considered harmless may come to be recognized as serious threats to the public wellbeing. Concomitantly, new technologies may render harmless conduct that previously put public health at great risk. For this reason it is difficult to apply general principles to the regulation of property. Indeed, the Supreme Court of the United States has recently conceded its own inability

> "to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978).

In recent years many courts have considered regulations that severely limit development in certain geographical areas. *Cf. id.* at 138, 98 S.Ct. at 2666, 57 L.Ed.2d at 657 (city may prevent alteration of privately owned historic structures). Areas that were previously considered valueless wastelands are now recognized as important ecological resources. In particular, marshlands adjacent to coastal areas and inland waterways are not recognized as vital to the economic and climatic well-being of society. In light of this fact, several courts have upheld regulations that deny developers the most beneficial economic use of their property. *Candlestick Properties, Inc. v. San Francisco Bay Conservation & Development*

*Commission, supra; Brecciaroli v. Commissioner of Environmental Protection*, 168 Conn. 349, 362 A.2d 948 (1975); *Lovequist v. Conservation Commission*, 393 N.E.2d 858 (Mass.1979); *Just v. Marinette County*, 56 Wis.2d 7, 201 N.W.2d 761 (1972).

In recognition of the immense value and importance of the coastal region of this state, the General Assembly chose to guard against potential danger to the area from certain types of development. General Laws 1956 (1980 Reenactment) § 46–23–1. In this case the council found that plaintiff's ISDS would introduce nitrogens, nitrates and phosphates in significant amounts into the marsh and that the effluent would reach the water table and flow with it. Furthermore, plaintiff's own witness testified that maintenance problems frequently cause this type of ISDS to malfunction. Thus the council's denial of plaintiff's application follows from the factual predicate that the system would produce a significant level of pollutants in an area meriting special protection.

In essence, plaintiff is asserting a right not only to use his property but also to discharge waste into the surrounding area.[1] This is a "property right" that this court refused to recognize in *Board of Purification of Waters v. Town of East Providence*, 47 R.I. 431, 133 A. 812 (1926); *see Harrington v. Board of Aldermen, supra. See generally* Sax, *Takings, Private Property and Public Rights*, 81 Yale L.J. 149, 159 (1971); Comment, *The Wetlands Statutes: Regulation or Taking?* 5 Conn. L.Rev. 64, 79 (1972) (individuals have no property right to "spillover" into adjacent public resources.)

■ In light of both the enormous ecological importance of coastal areas, as determined by the Legislature, and the findings of the council that this ISDS would introduce pollutants into this precariously balanced environment, we believe that this denial was an exercise of the police power

---

1. Cases relied on by plaintiff, such as *State v. Johnson*, 265 A.2d 711 (Me.1970), are inapposite because they deal with filling or dredging, not with the discharge of wastes. Indeed, the court in *Johnson* stated that

"[a]dditional considerations of health and pollution which are 'separable from and independent of' the 'fill' restriction may well support validity of * * * [regulations] in those areas of concern." *Id.* at 717.

for protection of the public health and safety. Within the framework of this action, we cannot and do not address claims that the landowner may have based upon the theory of inverse condemnation. It has been contended in theory that if regulation pursuant to police power deprives a landowner of all beneficial use of his property, the public must share in the loss by virtue of the constitutional right to just compensation guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States, as well as by art. I, sec. 16 of the Constitution of Rhode Island. *See Agins v. City of Tiburon, supra; United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359–60, 89 L.Ed. 311, 318 (1945); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 166, 67 L.Ed. 322, 326 (1922); *E & J, Inc. v. Redevelopment Agency of Woonsocket*, R.I., 405 A.2d 1187 (1979). In any event, because the Coastal Resources Management Council had no statutory authority to compensate plaintiff, no purpose would have been served by introducing extensive evidence in order to determine whether a factual underpinning could be established upon which a claim for inverse condemnation might be based in respect to the subject property. Accordingly, we defer this issue until it is raised in an appropriate proceeding with an adequate factual predicate.

## II

The plaintiff argues that the Legislature, in empowering the council to manage coastal development, has impermissibly delegated legislative power to an administrative agency. The trial justice rejected this contention.

The nondelegation doctrine derives from art, IV, sec. 1 and sec. 2, of the Rhode Island Constitution. These sections read as follows:

"§ 1. Constitution supreme.—This Constitution shall be the supreme law of the state, and any law inconsistent therewith shall be void. The general assembly shall pass all laws necessary to carry this Constitution into effect.

"§ 2. Power in general assembly—Enactment and style of laws.—The Legislative power, under this Constitution, shall be vested in two houses, the one to be called the senate, the other the house of representatives; and both together the general assembly. The concurrence of the two houses shall be necessary to the enactment of laws."

Although we have interpreted our State Constitution to forbid unconditional delegation of legislative power, *see City of Warwick v. Warwick Regular Firemen's Association*, 106 R.I. 109, 113, 256 A.2d 206, 209 (1969), we have also recognized the need for administrative expertise in the discharge of certain legislative functions. *Davis v. Wood*, R.I., 427 A.2d 332, 335–36 (1981); *J.M. Mills, Inc. v. Murphy*, 116 R.I. 54, 61, 352 A.2d 661, 665 (1976); *see State v. Peloquin*, R.I., 427 A.2d 1327, 1330 (1981). Indeed, we have long been mindful of the notion expressed by the North Carolina Supreme Court that

"the problems which a modern legislature must confront are of such complexity that strict adherence to ideal notions of the non-delegation doctrine would unduly hamper the General Assembly in the exercise of its constitutionally vested powers." *Adams v. North Carolina Department of Natural & Economic Resources*, 295 N.C. 683, 696–97, 249 S.E.2d 402, 410 (1978).

*Cf. South Terminal Corp. v. Environmental Protection Agency*, 504 F.2d 646, 677 (1st Cir. 1974) (agency must have flexibility; Congress cannot acquire sufficient information to manage detailed process of enforcement).

Thus, this court has acknowledged that "limited portions of the legislative power, if confined in expressly defined channels, may be vested by the general assembly in other bodies which it authorized to act as its agents or auxiliaries in carrying out its constitutional duties." *Opinion to the Governor*, 88 R.I. 202, 205, 145 A.2d 87, 89 (1958).

■ In sum, the delegation of legislative functions is not a per se unconstitutional

action. Instead, it is the conditions of the delegation—the specificity of the functions delegated, the standards accompanying the delegation, and the safeguards against administrative abuse—that we examine in determining the constitutionality of a delegation of power. *See Davis v. Wood*, R.I., 427 A.2d 332, 335–36 (1981); *De Petrillo v. Coffey*, 118 R.I. 519, 524, 376 A.2d 317, 319 (1977); *J.M. Mills, Inc. v. Murphy*, 116 R.I. 54, 61, 352 A.2d 661, 665 (1976); *Jennings v. Exeter-West Greenwich Regional School District Committee*, 116 R.I. 90, 98, 352 A.2d 634, 638–39 (1976); *City of Warwick v. Warwick Regular Firemen's Association*, 106 R.I. 109, 118, 256 A.2d 206, 211 (1969). *See generally A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 551, 55 S.Ct. 837, 852, 79 L.Ed. 1570, 1591 (1935) (Cardozo, J., concurring) (delegation permissible when "canalized within banks that keep it from overflowing"); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421, 55 S.Ct. 241, 249, 79 L.Ed. 446, 459 (1935) (despite need for wide range of administrative flexibility, constitutional system requires limitation).

In *Davis v. Wood* and *J.M. Mills, Inc. v. Murphy*, both *supra*, we upheld delegations that provided general directions to the administrative agencies. By enunciating sufficiently intelligible standards, the Legislature had adequately guided the actions of the administrative agencies.

Guided by these principles, we now direct our attention to the statute establishing the Coastal Resources Management Council, G.L. 1956 (1980 Reenactment) §§ 46–23–1 to 46–23–17, as enacted by P.L. 1971, ch. 279, § 1. In § 46–23–1 the Legislature clearly delineated the policy underlying the creation of the council:

"to preserve, protect, develop and where possible, restore the coastal resources of the state for this and succeeding generations through comprehensive and coordinated long-range planning and management designed to produce the maximum benefit for society from such coastal resources * * *."

Far from granting broad discretion to the council, the statute specifically directs the council to be guided by this single overriding criterion: "[P]reservation and restoration of ecological systems shall be the *primary guiding principle* upon which environmental alteration of coastal resources will be measured, judged, and regulated." (Emphasis added.) Section 46–23–1.

In the instant case, the exercise of authority by the council arose pursuant to a carefully crafted portion of the statute. Section 46–23–6(B) provides for implementation of the council's duties. With regard to land areas, the statute states:

"The authority of the council over land areas (those areas above the mean high water mark) shall be limited to that necessary to carry out effective resources management programs. This shall be limited to the authority to approve, modify, set conditions for, or reject the design, location, construction, alteration, and operation of specified activities or land uses when these are related to a water area under the agency's jurisdiction, regardless of their actual location. The council's authority over these land uses and activities shall be limited to situations in which there is a reasonable probability of conflict with a plan or program for resources management *or damage to the coastal environment*. These uses and activities are:

" * * *

"f) Sewage treatment and disposal and solid waste disposal facilities." (Emphasis added.)

This statute empowers the council to authorize, approve, modify, set conditions for, or reject sewage facilities when a reasonable probability of damage to the coastal environment exists. We are convinced that this provision delegates "limited portions of the legislative power, * * * confined in expressly defined channels * * *." *Opinion to the Governor*, 88 R.I. at 205, 145 A.2d at 89.

In addition to providing ample guidance to the council, the statute's provisions facilitate judicial review. A court reviewing

pursuant to the Administrative Procedures Act, G.L. 1956 (1977 Reenactment) §§ 42–35–15, and 42–35–16, may look to the statutory standards and safeguards in evaluating the council's actions. *See First Republic Corp. v. Norberg*, 116 R.I. 414, 423, 358 A.2d 38, 43 (1976).

Our analysis of this statute convinces us that the delegation of legislative authority to the council falls within the permissible bounds of art. IV. The necessity of agency expertise, together with the Legislature's clear statement of public policy, careful delineation of council jurisdiction, and the combination of these factors to provide adequate measures of council action, compel us to conclude that the delegation is permissible.

## III

The council in its June 1977 decision made specific findings of fact regarding the effect of plaintiff's ISDS on the surrounding marsh and barrier-beach environment. The council found "a significant probability that effluents from this system will reach the marsh area and further alter, and disturb the hydrology and biology within the barrier wetland." In addition, the council found that "there would be an introduction of nitrogens, nitrants, [sic] and phosphates into the marsh in significant amounts." The council based its findings on the testimony of Carleton Maine of the Rhode Island Department of Health and Dr. William E. Kelly of the University of Rhode Island. In addition the council considered the testimony of plaintiff's experts, Joseph Frisella and Leonard Facciani. The council concluded that based on the evidence, contradictions existed that weighed against acquiescing in the Department of Health approval. Accordingly, the council refused to concur.

The plaintiff contends that the council erred in denying his application. First, plaintiff asserts that he had already proven to the Department of Health that his ISDS would not pollute or interfere with the marsh. In essence, plaintiff claims that the council should have been bound by the Department of Health findings.

Furthermore, plaintiff argues, the principal witness upon whom the council relied was Carleton Maine, an employee of the Department of Health. The plaintiff states that this witness was incompetent to testify regarding a residential ISDS and furthermore that he should not have been permitted to speak for the Department of Health because that department had already given approval to the plan.

With regard to Maine's testimony, in pressing this point, plaintiff misperceives our role on a petition for certiorari. We have consistently held that we shall reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record. *Guarino v. Department of Social Welfare*, R.I., 410 A.2d 425, 428 (1980); *Millerick v. Fascio*, R.I., 384 A.2d 601, 604 (1978); *Lyons v. Liquor Control Administrator*, 100 R.I. 573, 576, 218 A.2d 1, 3 (1966).

Even were we to conclude that this testimony was improper, we would reverse only if it were the sole basis of the council's finding. *See Millerick v. Fascio*, R.I., 384 A.2d 601, 604 (1978). In this case, however, there was testimony from Dr. Kelly that this ISDS represented a potential harm to the marsh environment. Furthermore, plaintiff's own witness testified that maintenance problems are not uncommon with this type of ISDS and that breakdowns resulting from such problems could give rise to pollution. The plaintiff's challenge of the council's finding on this ground is without merit.

The plaintiff argues further that it "smacks of double jeopardy" to require him to prove the same facts before the Department of Health and the council. Of course, it is well settled that double-jeopardy analysis applies only in criminal cases and is entirely inapposite to the civil context. *Ventures Management Co. v. Geruso*, No. 79–311–A., 434 A.2d 252 (R.I., filed Aug. 25, 1981). Nevertheless, we understand plaintiff's argument as one based on the inconvenience of having to appear before separate tribunals. Although we recognize

that plaintiff has suffered some inconvenience, we are not persuaded that his constitutional rights have been violated.

There can be no question that plaintiff was required to demonstrate the attributes of his plan before two separate tribunals. It is also true that these forums came to different conclusions about the acceptability of this plan. We believe, however, that this result derived from the distinct functions of these tribunals as was implicit in the Department of Health's requirement that plaintiff present his plan to the council. The applicable statutes make this intention clear.

At the time of plaintiff's application the Director of Health[2] was charged with the responsibility

"(j) to require the prior submission of plans, specification, and other data relative to, and to inspect the construction of, disposal systems or any part thereof in connection with the issuance of orders, as provided by this chapter." Public Laws 1966, ch. 261, § 4.[3]

The General Assembly empowered the Department of Health to grant variances by order after considering submissions. Without such a variance order it was unlawful to discharge sewage into the waters of the state, to pollute said waters, or to construct a system designed to prevent pollution of the waters. Section 46–12–4.

"Pollution," under the terms of this statute, is described, in part, as "the entrance or discharge of sewage into any of the waters of the state in such quantity, either by itself or in connection with other sewage so discharged, as to alter the physical or chemical properties, or biology, of said

waters, including change in temperature, taste, color, turbidity or odor, and to cause or be likely to cause damage to the public, or to any person having a right to use said waters for boating, fishing or other purposes, or owning property in, under or bordering upon the same." Section 46–12–1. "Waters" means "tidewaters within the state and all inland waters of any river, stream, brook, pond or lake." Id.

We note the distinction between the specific definition of pollution above and the discretely distinguishable charge to the council to protect against "reasonable probability of * * * damage to the coastal environment." Section 46–23–6(B). Thus, although a plan such as plaintiff's might comport with specific Department of Health standards for the granting of a variance, it might nevertheless represent potential damage to the coastal environment under the standards of the council.

The Legislature in its wisdom established two different forums for control over the coastal environment. The Department of Health was charged with the specific task of determining whether plaintiff's ISDS would "pollute" the "waters" of the state under very specific definitions of those terms. Concurrently, the council was given the broader responsibility to protect against a reasonable probability of harm to the total coastal environment from various activities, including sewage disposal. We have no doubt that the Legislature could have assigned both functions to the same agency. In choosing not to do so, the Legislature doubtless considered the need for special types of expertise in the discharge of the separate but similar functions of both agencies.

**2.** In 1977 the General Assembly created the Department of Environmental Management, P.L. 1977, ch. 182, and conferred upon it many of the functions and duties previously vested in the Department of Health. Id. § 2 codified at G.L. 1956 (1977 Reenactment) § 42–17.1–2(e). Included in these functions were the duties regarding water pollution vested in the Department of Health by G.L. 1956 (1970 Reenactment) chapter 12 of title 46.

**3.** This section currently empowers the Director of Environmental Management

"(j) to approve, pursuant to standards adopted by the environmental standards boards, the construction, modification and operation of disposal systems or any parts thereof and to require the prior submission of plans, specifications and other data relative to disposal systems and to inspect such systems either under construction or in operation." General Laws 1956 (1980 Reenactment) § 46–12–3(j).

274

We recognize that a certain inconvenience was caused to plaintiff as a result of the Legislature's delegation of these aspects of the police power to separate tribunals. As the trial justice noted, this property owner has suffered a brand of "legislative inundation." We are unable to conclude, however, that the Legislature in any way exceeded its authority or violated plaintiff's rights in creating separate tribunals. Thus we cannot fault the council for coming to a conclusion separate and distinct from the Department of Health.

We note further that the Department of Health imposed conditions on the ISDS regarding the continued efficient use of the system. The plaintiff's witness testified before the council to the effect that maintenance problems frequently interfered with the workings of the ISDS. Thus, the council would have been warranted in concluding that this ISDS probably could not have been maintained in working order.

The remaining issues raised by the plaintiff are without merit and need not be specifically discussed in this opinion. The petition for a writ of certiorari is denied and dismissed, the writ heretofore issued is quashed, and the papers in the case are ordered returned to the Superior Court with our decision endorsed thereon.