CONSTANT S. HORTON, Deputy Chief vs. OLD COLONY BILL POSTING COMPANY.

JUNE 26, 1914.

PRESENT:   Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1)   Billboards.   Constitutional Law.*

Public Laws, cap. 542, passed January session, 1910, "An act authorizing cities and towns to regulate certain out-door advertising," and Chapter 443 of the ordinances of the city of Providence, passed pursuant to the authority of Pub. Laws, cap. 542, are not obnoxious to Cons. R. I., Art. I, § 10, and Cons. U. S., Art. XIV of amendments, § 1, as depriving a person of his property without due process of law, nor as denying to a defendant the equal protection of the laws, in violation of the 14th amendment Cons. U. S., nor as depriving a defendant of his property without just compensation in violation of Cons. R. I., Art. I, § 16, and the 14th amendment Cons. U. S., nor as depriving a defendant of the right of judicial inquiry as to his vested rights and vesting an unjudicial officer and body with judicial powers in violation of Sections 14 and 15 of Art. I, and of Section 1 of Art. X, Cons. R. I.

*(2)·   Billboards.   Constitutional Law.*

Public Laws, cap. 542, passed January session, 1910, § 2 (the enabling act), and cap. 443 of the ordinances of the city of Providence, the so-called "Billboard" ordinance, Section 1, set forth that it is their purpose "to preserve the health, safety, morals and comfort of the inhabitants of this state." The ordinance excepts "advertising located upon private property, and relating exclusively to business conducted upon such property, or the sale or rental thereof or advertising in or upon the cars and stations of any common carrier."

*Held*, that the exemptions made by the act and ordinance were expressly within the purview of Pub. Laws, cap. 472, an act "in relation to buildings in the city of Providence," which act was not superseded in any manner by Pub. Laws, cap. 542, and therefore the act and ordinance were not invalid as making an unjust and unreasonable discrimination by means of an attempted classification between those doing a similar business, but that the provisions of Chapter 542 as applied to those doing an out-door advertising business were fully warranted by the nature of that business and expressly provided that any regulation of any ordinance adopted by authority of the act must be reasonable in its requirements.

*(3)   Billboards.   Reasonable Regulations.*

Cap. 443 of the ordinances of the city of Providence, the so-called "Billboard" ordinance, in prohibiting the advertising of intoxicating liquors within 200 feet of schools and churches; in requiring structures on the roofs of buildings within the close building district to be constructed of

incombustible material; in regulating the location upon roofs so that the structure would not be liable to fall into the street; in regulating their size and construction so as to diminish fire danger; in regulating the size and position of structures attached to the ground to insure the safety of passers by; in requiring substantial construction and bracing and in regulating the electrical illumination of billboards and illuminated signs; in providing for the making safe or removal by the owner or other person interested of any billboard that becomes dangerous to the public; in requiring that the plans and specifications shall be approved by the inspector of buildings; in prohibiting the display of immoral matter and requiring the approval of the police commissioners of all matter displayed; and in providing for fines for violation of the ordinance and for the removal of the structures after conviction for such violation,—is in all respects strictly within the powers conferred by cap. 542, Pub. Laws, 1910, and is not unreasonable in any of said provisions, and is clearly an exercise of the police power "to preserve and promote the public safety, health, morals, comfort and general welfare."

*(4)    Billboards.    Reasonable Regulations.*

In view of the wide latitude permitted the legislative branch in determining the public needs and the appropriate remedies, the court should uphold the limitations on size imposed upon out-door advertising structures where in the opinion of the court, such limitations are not clearly unreasonable.

*(5)    Constitutional Law.    Taking Private Property.*

An ordinance passed under the authority of an enabling act, prohibiting advertising upon estates or buildings owned or controlled by the municipality or on any tree, post, pole or municipal property within the occupation line of any street, is not obnoxious to the constitutional prohibition of taking private property without due process of law.

*(6)    Constitutional Law.    Police Power.    Due Process of Law.*

Reasonable regulations of the use of property under the police power do not constitute a "taking of property without due process of law." No compensation need be made for interference with the use of property caused by reasonable police regulations.

*(7)    Constitutional Law.    Trial by Jury.    Judicial Powers.*

Pub. Laws, cap. 542, §§ 2 and 3, authorizes any city or town council to regulate by ordinance out-door advertising as to the place where it may be permitted, the size and kind of structures, and its subject-matter, provided such regulations shall be reasonable, and for the approval of such advertising in respect to all of the above matters, by a city or town officer, and it gives the right of appeal to the town or city council.

Sec. 11 of cap. 443 of the ordinances of the city of Providence, prohibits the display on any board put up for out-door advertising, of matters of an indecent or immoral character, or depicting the commission of any crime, and provides for the written approval of the police commissioners.

*Held,* that the powers conferred upon the police commission were not judicial powers, under Cons. R. I., Art. X, § 1, neither did the power thus granted violate Cons. R. I., Art. I, § 15, "The right to trial by jury shall remain inviolate."

CRIMINAL COMPLAINTS.   Certified on constitutional questions.

PARKHURST, J.   These complaints are for the violation of an ordinance of the city of Providence, regulating out-door advertising.   One charges that the defendant "did unlawfully use for the display of out-door advertising, a certain structure, to wit: a billboard, located upon and over the Union street side of the roof of that certain building situated on the northeasterly corner of Fountain and Union streets," etc. (within the first building district of said city), "said structure not being constructed throughout of incombustible material as such term when referred to as a structural material is defined in Chapter 472 of the Public Laws," an offense under Section 4 of said ordinance.

The other complaint charges, that the defendant "did unlawfully construct and use for the display of out-door advertising, a certain structure, all the supports and parts thereof set in and resting upon the ground, not being of brick, stone, terra cotta, concrete or metal, alone or in combination with any other or others of the same, said structure being situated on the southerly side of Huntington avenue, at and near Noyes avenue, in said city of Providence, attached to the ground, more than six feet in height, not securely and immediately attached to the outside surface of a building, nearer the line of said Huntington avenue than a distance equal to the height of said structure," an offense under Section 6 of said ordinance.

These complaints were duly prosecuted in the police court of the city of Providence between August 20, 1912, and March 26, 1913; on the latter date, the defendant having without trial admitted evidence sufficient to convict (having previously moved to quash and said motion being denied) was

adjudged guilty and sentenced to pay a fine, and appealed to the Superior Court. In the Superior Court, defendant again filed its motion to quash, raising certain constitutional questions; whereupon an order was made May 3, 1913, certifying said constitutional questions to this court.

The ordinance of the city of Providence referred to in these proceedings is Chapter 443 of the ordinances of the city of Providence, approved July 11, 1910, passed pursuant to authority given by the General Assembly under Chapter 542 of the Public Laws of Rhode Island, January session, 1910; approved April 14, 1910.

Said Chapter 542 of Public Laws of Rhode Island, January session, 1910, reads as follows:

## "AN ACT AUTHORIZING CITIES AND TOWNS TO REGULATE CERTAIN OUT–DOOR ADVERTISING.

### (Approved April 14, 1910.)

"*It is enacted by the General Assembly as follows:*

"SECTION 1. The term 'out-door advertising' as used in this act shall apply only to all such advertising now or here-after displayed so as to attract the attention of persons on any public highway, or while in the vehicle of any common carrier, or in any station of such carrier, or while in any public building, public park, public grounds, or other public places, whether such advertising be by means of printing, writing, picture, or a combination thereof, and whatever may be the means of display, except that it shall not include advertising, located upon private property and relating exclusively to the business conducted on such property or the sale or rental thereof, or advertising in or upon the cars and stations of any common carrier.

"SEC. 2. In order to preserve the health, safety, morals, and comfort of the inhabitants of this state, the city council and town council of every city and town, in addition to any powers now enabling, shall have power by ordinance to regulate such out-door advertising in such city or town, as to

the place where such advertising may be permitted, the size and kind of structures upon which it may be placed, and the subject-matter that may appear thereon: *Provided*, such regulations shall be reasonable in their requirements.

"SEC. 3.  In order more effectively to secure compliance with such regulations, any such ordinance may provide that no such out-door advertising shall be maintained or displayed unless such out-door advertising, in respect to all the matters specified in Section 2 hereof, shall be first approved, by a city or town officer designated in such ordinance, as being in conformity with such regulations: *Provided, however*, that, whenever such officer shall refuse or withhold such approval, application may be made to such city or town council for its approval of the same; and if approved by such city or town council, as being in conformity with such regulations, no approval of such city or town officer shall be required before maintaining or displaying the same.

"SEC. 4.  Any person who shall violate any of such regulations, or maintain or display any such out-door advertising without such approval in any city or town where such approval is required, shall be fined not exceeding ten dollars for every day such violation, maintenance, or display shall continue.  Any and all officers authorized by such ordinance shall have the right to enter upon the premises where such out-door advertising is maintained or displayed, for the purpose of inspecting the same, and may remove any and all such out-door advertising and structures which are not in conformity with such regulations: *Provided*, any person maintaining or displaying the same shall have been convicted of any violation of this act regarding the same.

"SEC. 5.  This act shall take effect from and after July 1, 1910."

Said Chapter 443 of the city ordinances reads as follows:

"An Ordinance to Regulate Out–Door Advertising in the City of Providence, and to Preserve the Safety, Health, Morals, Comfort and Welfare of the Inhabitants of said City.

(Approved July 11, 1910.)

"*It is ordained by the City Council of the City of Providence as follows:*

"Section 1.  In pursuance of the powers conferred upon the city council by Chapter 542 of the Public Laws, passed at the January session, A. D. 1910, and of all other powers conferred upon the same or the city of Providence by general and special laws hereunto enabling, and in order to preserve and promote the public safety, health, morals, comfort and general welfare, the following regulations and laws are hereby made and established respecting the following matters and things within the city of Providence.

"Sec. 2.  The term 'out-door advertising' as used in this ordinance shall apply only to all such advertising now or hereafter displayed in the city of Providence so as to attract the attention of persons on any public highway, or while in the vehicle of any common carrier, or in any station of such carrier, or while in any public building, public park, public grounds, or other public places, whether such advertising be by means of printing, writing, picture or a combination thereof, and whatever may be the means of display, except that it shall not include advertising located upon private property and relating exclusively to the business conducted on such property or the sale or rental thereof, or advertising in or upon the cars and stations of any common carrier.

"Sec. 3.  No out-door advertising of whiskey, ale, wine, rum or other strong or malt intoxicating liquor, the sale of which without a license is prohibited by the General Laws of the state, shall be permitted within two hundred feet of the premises of any public or parochial school or of any church.

"Sec. 4.  All structures constructed or used for the display of out-door advertising, located upon or over the roof of

any building or buildings in the territory comprised within the first or close building district in the city as now established by law, shall be throughout of incombustible material. as such term when referred to as a structural material is defined in Chapter 472 of the Public Laws, passed at the January session, A. D. 1909.

"Sec. 5. No structure or billboard, constructed or used for the display of out-door advertising, shall be located upon or over the roof of any building in any part of the city in such place thereon or thereover that, if it should be blown down by wind, or should fall by reason of its supports or any part of the building becoming decayed or otherwise out of repair or condition, or by reason of such supports or any part of the building being consumed or damaged by fire, it or any part thereof would be liable to fall upon any street, lane or other public traveled way; and to more definitely secure the public safety and diminish the danger from fire, no such structure or billboard, located upon or over the roof of any building in the city, shall be constructed more than nine and one-half feet high nor, if elevated on supports, more than eleven and one-half feet high over all, measuring from the part of the roof where the same is located, nor shall any one of the same be constructed more than twenty feet in length nor without leaving open spaces over the building beyond the two ends each at least two feet wide, nor any two or more of the same without open spaces over the building between and beyond the several ends at least two feet wide, nor shall any of the same be constructed in any manner that will prevent firemen from having reasonable access from any street, lane or other public traveled way by means of ladders to the roof of the building and the parts of the same behind such structure or billboard, nor shall any structure or billboard be attached to or placed upon any part of any building in the city so as to obstruct any window thereof or fire escape thereon nor in front of the cornice or coping of any such building so as to prevent firemen from having reasonable access from any street, lane or other public traveled way by means of ladders to the roof of the building.

"Sec. 6.  No billboard or other like structure in the city constructed or used for the display of out-door advertising, which is attached to the ground, and which is more than six feet in height from the ground, and which is not securely and immediately attached to the outside surface of a building, shall be located nearer the line of any street, lane or other public traveled way, or the line of any lot upon which any building is located or which is otherwise in use, than a distance equal to the height of such billboard or structure, unless all supports or parts thereof set in or resting upon the ground shall be of brick, stone, terra cotta, concrete or metal, alone or in combination with any other or others of the same, and unless such billboard or structure shall be securely attached to such supports or parts thereof.   To better secure the public safety, to prevent nuisances, and to promote the other public objects hereof, no such billboard or structure shall be constructed more than nine and one-half feet high, nor including its supports more than eleven and one-half feet high over all, measuring from the ground, where the same is located, except where the grade of the ground is not sufficiently level to permit the board or structure to be on a level, in order to allow, for the purpose only of having the same on a level, higher supports without diminishing the height of the board or structure, such board or structure may be erected to such greater height as may be necessary for said purpose, but in no event shall the highest end or other highest point thereof be more than fourteen and one-half feet over all above the ground, and every such billboard and structure shall be so constructed and elevated on posts or other supports that every point of the lowest edge thereof shall be at least two feet above the ground where the same is located, with a clear space below such board or structure between the posts or other supports, and no such billboard or structure shall exceed thirty-six feet in length, and there shall be an open space of at least two feet between any two such billboards or structures.

"SEC. 7.   Every structure or billboard within the purview of this ordinance may have a further structure or extension immediately attached to the top of such structure or billboard to be used only for placing thereon the owner's name and place of business, such further structure or extension to be not more than six feet in length nor more than six inches in height, and to be constructed and maintained subject to and in conformity with all the provisions of this ordinance applicable thereto, except that the height of the same shall not be included in any of the heights hereinbefore specified, but may be in addition thereto.

"SEC. 8.   Every structure and billboard within the purview of this ordinance shall be substantially and safely constructed, fastened and secured, and when reasonably necessary shall be thoroughly anchored or braced or both, and especially so when located upon or over the roof of any building in the city.   The installation of all apparatus, wires and lamps attached or appurtenant to any such structure or billboard for the electric illumination thereof, shall be in accordance with the rules and requirements of the insurance association of Providence in force at the time the work is done.   No such structure or billboard, which or any part of which is made of wood, shall have any attachments or appurtenances for electric or other illumination of the same.

"SEC. 9.   Every structure and billboard constructed or used for the display of out-door advertising, now or hereafter existing, shall be kept and maintained by the owner or other person or persons interested therein in such condition and state of repair as not to be dangerous; and every such structure and billboard, now or hereafter existing, which is or shall become dangerous for any reason or in any manner whatever, or dangerous to the public on any street, lane or other public traveled way, or which shall be especially dangerous in case of fire for any reason or in any manner whatever, shall be made safe or be removed as may be necessary by the owner or other person or persons interested therein, or if

he or they shall fail so to do, by the owner of the building or premises on or over which the same is located. If any such structure or billboard, now or hereafter existing, shall at any time appear to the inspector of buildings of the city to be dangerous for any reason or in any manner whatever, or dangerous to the public on any street, lane or other public traveled way, or to be especially dangerous in case of fire for any reason or in any manner whatever, he shall in writing give notice thereof to the owner or other person or persons interested therein, and order such owner, person or persons to make the same safe or to remove the same, as may be necessary, and to begin the required work within such reasonable time as may be prescribed by him in such order, and to complete the same as expeditiously as practicable. If such owner, person or persons shall fail so to do, said inspector may give like notice and order to the owner of the building or premises, on or over which such structure or billboard is located, prescribing therein a reasonable time for beginning the work by the owner of such building or premises. Every such notice and order may be served in any manner specified in Section 39 of said Chapter 472 of the Public Laws. It shall be the duty of every such owner or person notified pursuant hereto to comply with the requirements of such order. If upon the trial of any complaint for any violation of any such order, it shall be found by the court or jury that the structure or billboard at the time of such notice or order was in fact not dangerous as aforesaid, such order shall be annulled and the defendant discharged.

"Sec. 10. No out-door advertising shall be placed, maintained, or displayed on or as part of any structure or billboard within the purview of this ordinance, which shall not be constructed and located in conformity with the provisions of this ordinance. No structure or billboard constructed or used for the display of out-door advertising shall hereafter be erected, constructed, relocated, rebuilt, altered, changed or materially repaired, unless the plans thereof and specifications therefor and designation of any new location

thereof shall first be filed with the inspector of buildings of the city, and be approved by him in writing, as in conformity with the provisions of this ordinance.　Except as in this ordinance otherwise expressly provided, this ordinance shall not be construed to affect or prevent the continued maintenance or use of any such existing structures and billboards, but all the same when relocated, rebuilt, altered, changed or materially repaired, shall be constructed and located subject to and in conformity with the provisions of this ordinance.

"SEC. 11.　No out-door advertising of an obscene, indecent, licentious or immoral character or kind, or depicting the commission of any crime, shall be displayed or maintained on or as part of any billboard or structure, constructed or used for the display of out-door advertising and now or hereafter existing.　In order more effectually to secure compliance with this regulation, no out-door advertising shall be displayed, exposed, posted up or exhibited on or as part of any such billboard or structure, unless the subject-matter thereof shall have first been approved by the board of police commissioners of the city in writing, as in conformity with this regulation.

"SEC. 12.　No structure or billboard shall be constructed or used for out-door advertising, and no out-door advertising shall be displayed or maintained, in or on any park, school or hospital, estate or building owned or controlled by the city, or any estate or building owned or controlled by the city and used for public purposes, or any vacant lot or land owned and controlled by the city, or on any fence, wall or appurtenance of any of the same, or on any tree, post, pole or city property within the occupation line of any street or highway.

"SEC. 13.　Every person, whether principal or agent or acting in any capacity who shall violate any of the regulations hereof, or maintain or display any such out-door advertising without the approval herein required, shall be subject to a fine of not exceeding ten dollars for every day such violation, maintenance, or display shall continue, as prescribed in said Chapter 542 of the Public Laws.

"SEC. 14. After any person, maintaining or displaying any out-door advertising or any structure or billboard, in violation of any of the provisions of Sections 4 or 5, or any other section hereof applicable to any out-door advertising, structure or billboard upon or over the roof of any building in the city, or the display, location, construction, maintenance or use thereof, shall have been convicted of such violation, the board of fire commissioners of the city shall cause the same to be removed. After any person, maintaining or displaying any out-door advertising or any billboard or structure, in violation of any of the provisions of Section 6 or any other section hereof applicable to any out-door advertising, billboard or structure located on or attached to the ground, or the display, location, construction, maintenance, or use thereof, shall have been convicted of such violation, the inspector of buildings of the city shall cause the same to be removed. Said inspector shall cause any out-door advertising and any structure constructed for out-door advertising in violation of Section 12 hereof to be removed. After any person maintaining or displaying any out-door advertising in violation of any of the provisions of Sections 3 or 11 hereof shall have been convicted of such violation, said board of police commissioners shall cause the same to be removed, except if the same be upon or over the roof of any building, said board of fire commissioners shall cause the same to be removed. The expenses of such removals shall be charged to the appropriations for the departments, respectively, whose officers cause such removals.

"SEC. 15. Every provision of every regulation hereof is intended to be separable so far as possible, and if any special requirement, restriction, limitation, or provision herein, although intended to be reasonable, should be adjudged to be invalid, it is not intended that the same shall affect the validity of any other provision or provisions herein, and it is intended that every general provision referring to or involving other provisions herein shall apply only to all such other provisions as are valid.

"Sec. 16.   This ordinance shall take effect upon its passage."

The grounds of the alleged unconstitutionality were set forth in the motion to quash as follows:

"First.   That said Chapter 542 and said ordinance deprive the defendant of his property without due process of law contrary to the law of the land, and in violation of Section 10 of Article I of the Constitution of the State of Rhode Island, and of the fourteenth amendment to the constitution of the United States, inasmuch as under its provisions he is deprived of rights legally belonging to him as the owner of property, before and at the time of the enactment of said chapter and ordinance.

"Second.   Because said Chapter 542 and said ordinance deny to him the equal protection of the laws in violation of the fourteenth amendment to the Constitution of the United States in this, that the defendant is denied the enjoyment and use of his property upon the same terms and conditions and with the same rights as others.

"Third.   Because said Chapter 542 and said ordinance deprives the defendant of his private property without just compensation, in violation of Section 16 of Article I, of the Constitution of the State of Rhode Island and of the fourteenth amendment to the Constitution of the United States.

"Fourth.   Because Section 3 of said Chapter 542 and Section 11 of said ordinance, deprives the defendant of the right of judicial inquiry as to his vested rights and vests an unjudicial officer and body with judicial powers in violation of Sections 14 and 15 of Article I and of Section 1 of Article X of the Constitution of the State of Rhode Island."

The questions thus raised may be briefly stated as follows:

1.   Is the defendant deprived of its property without due process of law and contrary to the law of the land?

2.   Is there any unjust discrimination or classification by which the defendant is denied the enjoyment and use of its property upon the same terms and conditions and with the same rights as others?

3.   Is the defendant deprived of its property without just compensation?

4.   Is the defendant deprived of the right of judicial inquiry as to his vested rights, and are judicial powers vested in an unjudicial officer or body?

As these questions are raised upon motions to quash, the decision of them must be based solely upon the face of the law and of the ordinance.

Prior to consideration of these specific questions in detail, and to clear the way for such consideration, certain general contentions of the defendant may be first disposed of.

Defendant's counsel contends that both the title of Chapter 542 and the words of Section 1 thereof and of Section 2 of the ordinance show that the purpose thereof is not to safeguard either public health, safety or order, in that by excepting from the provision of the law and of the ordinance "all structures located upon private property used by the occupants and the stations of common carriers, a distinction is made between out-door advertising as defined, and advertising out of doors, when, in fact, as far as it relates to structures assumed to be dangerous, both are identical."

If we rightly understand these words quoted from defendant's brief, the defendant appears to claim, that, because this act and ordinance only purport to regulate what is expressly defined as "out-door advertising," and expressly except "advertising located upon private property and relating exclusively to business conducted on such property or the sale or rental thereof, or advertising in or upon the cars and stations of any common carrier," it is therefore to be inferred that it was not the purpose to "safeguard either public health, safety or order," because certain structures equally dangerous thereto are omitted from the operation of the law; and the defendant's counsel also appear to claim that this attempted classification and separation works an unjust, unlawful and unreasonable discrimination between it and others doing substantially the same acts without restraint, and that therefore the act and the ordinance are

void.   Defendant's counsel argue as if, and appear to claim that the exemptions expressly made by this act and ordinance left the structures used for such advertising entirely free from regulation and control; but such is not the fact.   Counsel for both parties in these cases have ignored the provisions of Chapter 472 of the Public Laws of the January session, 1909, which is a very elaborate act "in relation to buildings in the city of Providence," etc., approved April 30, 1909.   Reference is here made to Section 32 of said act, which is as follows:

"Unsafe Buildings, Etc.

"Sec. 32.   Every building and structure, part and appurtenance thereof shall be kept and maintained by the person or persons interested therein in such condition and state of repair as not to be dangerous.   If any building or part of a building, staging or other structure, or anything attached to or connected with any building, or other structure, on any estate in said city, shall from any cause be reported unsafe, the inspector shall examine such structure, and, if in his opinion the same be unsafe, he shall immediately notify the owner, agent, or other person having an interest in said structure, to cause the same to be made safe and secure, or that the same be removed, as may be necessary. The person so notified shall be allowed until twelve o'clock noon, of the day following the service of such notice, in which to commence the securing or removal of the same; and he shall employ sufficient labor to remove or secure the said building as expeditiously as can be done:   *Provided, however,* that in a case where the public safety requires immediate action, the inspector may enter upon the premises with such workmen and assistants as may be necessary, and cause the said unsafe structure to be shored up, taken down, or otherwise secured, without delay, and a proper fence or boarding to be put up for the protection of passers by.

"When the public safety does not demand immediate action, if the owner, agent, or other person interested in said

unsafe structure, having been notified, shall neglect or refuse to comply with the requirements of said notice within the time specified therein, then a careful survey of the premises shall be made by three disinterested persons, one to be appointed by the inspector, one by the owner or other interested person, and the third chosen by these two, and the report of such survey shall be reduced to writing, and a copy served upon the owner or other interested person; and if said owner or other interested person refuses or neglects to appoint a member of said board of survey within the time specified in said notice for complying with said requirements, then the survey shall be made by two competent architects, builders, engineers or mechanics, to be appointed by the inspector, and in case of a disagreement they shall choose a third person, and the determination of a majority of the three so chosen shall be final.

"Whenever the report of any such survey shall declare the structure to be unsafe and the owner or other interested person shall for three days neglect or refuse to cause such structure to be taken down or otherwise to be made safe, the inspector shall cause such structure to be taken down or made safe."

The further paragraphs of said section need not be quoted at large; but in general terms they provide for a lien on the estate for the value of work and materials; for a fine in case of refusal or neglect to obey the order for removal or repair; and for an application to the Superior Court for a jury trial and for such trial, etc. This act is directly applicable to the city of Providence, and does not require the passage of any ordinance to carry out its provisions.

It is manifest from the provisions last above quoted that they are broad and general, and are quite comprehensive enough to include all fences and billboard structures and other like structures "on any estate in said city," whether on the ground or "attached to or connected with any building, or other structure," and whether or not they are for the time being in use for advertising purposes; and that

they also cover any such structures upon the stations of any common carrier, in said city.    It is to be noted also that the provisions of Chapter 542 of the Public Laws, above quoted, are expressly "in addition to any powers now enabling" (Sec. 2).    So that said Chapter 542 is not intended to supersede the provisions of the "building law" of Providence, but to be in addition to the powers of regulation already previously conferred upon the city of Providence by said Chapter 472.    Having by said last quoted act conferred upon the city of Providence, very general powers of regulation covering all such structures, whether fences, billboards on the ground, or billboards on buildings, and other structures whether actually used for advertising the business done on the premises or the sale of the property or not used at all for advertising, or used for advertising as a business described as "out-door advertising," it was deemed wise by the legislature, presumably upon request of parties interested and after proper examination and inquiry, and upon full knowledge of the facts, to pass the special act (Chap. 542) specially directed to the regulation of "out-door advertising" as defined and the structures used therefor; and it seems to us that the reasons for so specially regulating this class of advertising and structures are very obvious.    In the first place it is obvious that by far the larger part of the billboards and similar structures used for advertising purposes are used by advertising companies for general, miscellaneous advertising, not related to the business carried on upon the premises; and that such "out-door advertising" has become in recent years a separate and distinct business and has grown to great proportions and importance, employing a great and constantly increasing number of billboard structures.    So far as such structures are used solely by the occupant or owner of the property for advertising either the sale of the property itself, or the business carried on upon the same, the regulation of such structures may well be left to the general broad provisions of the "building law" which are ample to prevent such structures from becoming or remaining

dangerous to the public or to the occupants of the building or the passers-by; and inasmuch as these structures are used and maintained by the owner or occupant of the property for his own use and as incident to his own business and only indirectly for profit, and always subject to his direct inspection and control, they may to a certain extent be deemed less dangerous to the public for the reason that the owner or occupant would be likely to make and keep then safe as a matter of selfish interest for the protection of the rest of the property itself, as well as for the protection of those who do business with him passing to and from the premises over the public ways and the approaches to said premises. On the other hand it is also obvious that structures used by the advertising companies for "out-door advertising" are used exclusively for profit; that it would be natural for such companies to endeavor to make all the profit possible from the use and rental of such structures, and that, not being directly interested in the property upon which such structures are maintained or in the business done thereon or in the patrons of such business, and being lessees for the purpose of such structures only for short terms, they would be less likely either originally to build such structures in a safe and desirable manner, or to take such care to keep them safe and durable. Furthermore, we think it is for the interest and benefit of the "out-door advertisers" themselves doing such a distinct and separate and important business as they do, to have distinct standards of construction laid down in the law, whereby they may be guided. A lack of such distinct standards has often been the ground of criticism of such laws, and might be made a ground of such criticism in regard to that portion of the "building law" of Providence, above quoted, were it not for the careful provisions for survey and final determination of dangerous conditions therein set forth.

From all these considerations we find therefore that the argument of defendant, claiming the invalidity of the law and ordinance in question, based upon an unjust, unlawful

and unreasonable discrimination growing out of an attempted classification, is without foundation in view of the provisions of "the building law" above quoted; we find further that there is no classification other than that which is implied in the more minute provisions and standards of the special act (Chap. 542), and that these, as applied to the defendant and others doing like business, are fully warranted by the nature of their business, are really and substantially for their benefit in establishing definite standards, and do not constitute any unjust discrimination.

We also find that the defendant's contention that by reason of such alleged discrimination it is apparent that it was not the purpose of the act and of the ordinance to "safeguard either the public health, safety or order," has no force, because we find that there is no such discrimination. On the contrary it is apparent from both of the acts and the ordinance above quoted that it is their purpose to "preserve the health, safety, morals and comfort of the inhabitants of this state," just as is set forth in express terms in Section 2 of the act (Chap. 542) and in Section 1 of the ordinance (Chap. 443). All of the provisions of the act and of the ordinance are in harmony with this view. The act is merely an enabling act to this end, by its express terms, and provides for the imposition of fines and for the abatement of illegal structures after conviction; and the restriction upon the regulations empowered to be adopted by the ordinance is: "*Provided*, such regulations shall be reasonable in their requirements" (Sec. 2 of Chap. 542). Since we have found that there is no unlawful discrimination as between classes of advertisers, but on the contrary, that all classes of advertisers are within the scope of the acts above quoted, it is next to be considered whether or not the provisions of the ordinance are reasonable, and calculated "to preserve and promote the public safety, health, morals, comfort and general welfare." (Ord. Chap. 443, Sec. 1.) Section 2 of the ordinance defines "out-door advertising" strictly as set forth in the act; this has already been sufficiently set forth, and need not be further discussed.

Section 3 prohibits advertising of intoxicating liquors within two hundred feet of schools or churches. The state spends thousands of dollars upon schools and education, and encourages religious and moral development. To allow liquor advertisements to be placed in close proximity to schools and churches is inconsistent with the objects of secular and religious education. Such advertisements so located would be very offensive to a large part of the public, and would be not in proper place there. Education by pictorial advertisement in the brands of intoxicating liquors and suggestions to quench the thirst by intoxicating liquors are manifestly not proper for youth attending school or church, and the public in their relations to school and church have the right not to have such suggestions thrust upon their notice against their will by flaring liquor advertisements so located. The reasonableness of this provision is easily justifiable on educational, moral and welfare grounds; no court has held such a provision bad in any case brought to our attention.

Section 4 requires that outdoor advertising structures erected on the roofs of buildings within the first or close building district of the city shall be constructed throughout of incombustible material. The inherent reasonableness of this provision is apparent. Such a provision would undoubtedly render the most congested and most important part of the city less liable to fire; and would make such structures less dangerous to the throng of people that congest the most populous city streets. There is no case cited against the reasonableness of an exactly similar provision. Two billboard cases required *all* advertising structures to be constructed of noncombustible materials. See *Chicago* v. *Gunning System*, 214 Ill. 628, 641, and *People* v. *Hastings*, 137 N. Y. Supp., 186, 190; in both these cases the court held the provisions unreasonable because they applied uniformly to all billboards and advertising structures throughout the city regardless of their location. This is clearly different from the ordinance at bar, which limits the provisions to the

most congested portions.   Had the provisions in those other cases been so limited they would undoubtedly have been upheld, as appears from the language of the opinions.   Thus it is said in *Chicago* v. *Gunning System, supra*, p. 641; "We do not hold that this ordinance is so unreasonable as to be void if it were limited to particular districts of the city." No case strikes down a provision such as the one here under consideration.

Section 5 provides that no billboard or structure for outdoor advertising placed on roofs in any part of the city shall be so placed that they will be liable to fall upon any street, lane or other public traveled way; and to better secure public safety and diminish fire danger, it prohibits such structures over nine and one-half feet high, or including the supports eleven and one-half feet, or more than twenty feet long, and requires a two-foot open space over the building at each end of the structure; it also prohibits their construction in such manner as to prevent firemen from having reasonable access from streets by ladders, etc., or in any way that will obstruct windows or fire escapes.

The manifest purpose of the provisions of this section is to prevent such boards or structures from tumbling off the roofs to the possible injury of passers-by below, and also to keep the roofs free from obstruction to firemen.   The provisions that such structures shall not be placed on any roof so that they will be liable to fall into publicly traveled ways is inherently reasonable.

The provisions limiting the sizes of such structures to eleven and one-half by twenty feet and requiring a two-foot open space over the building at either end of the structure, are not unreasonable.   Such structures should have some limitation as to size; and the court in order to strike down such provision must be able to say that there is no fair reason to fix such a limit.   We are unable to say that any of these provisions are unreasonable; they are all intended to promote public safety.

The further provision of this section prohibiting their erection in such manner as to prevent firemen from having access from the streets by ladders, etc., or that will obstruct windows or fire escapes, bears its reason on its face.

Section 6 applies to billboards or outdoor advertising structures attached to the ground. It provides that all such structures over six feet high, not securely and immediately attached to the outside surface of a building, shall not be located nearer the public way or building line than a distance equal to the height of such structure, unless all supports resting in or upon the ground shall be of brick, stone, terra cotta, concrete or metal, and unless such structure shall be securely attached to such supports.

The manifest purpose of this provision is safety to passersby. It does not prohibit structures under six feet high erected throughout of wood and without such brick, stone, etc., supports; nor does it prohibit the erection of such structures six feet or more in height even upon the building or lot line. The legislature apparently had regard for degrees of danger and did not consider such structures of six feet or less in height from the ground, potential of danger, but structures over that height they deemed potential of danger. And it should be further noticed that structures over six feet in height (up to the limit of 11½ feet over all) are not prohibited; if they are securely or immediately attached to the outside surface of a building, or if all their supports resting in or upon the ground are of brick, stone, concrete, metal, etc., and such structures are securely attached to such supports, then they can be built over six feet high even on the building line. In short, the provisions do not prohibit structures over six feet high erected even upon the building line *if they are safe*, that is, if attached directly to buildings or if set upon and attached to certain durable and nonrotting supports.

This distinction is vital and important. Counsel for the defendant clearly misunderstand and misstate this section; they appear to claim that this section of the ordinance pro-

hibits the erection of billboards within the prescribed distance from the street or building line, thereby precluding the use of such space for billboards and advertising structures. They cite cases to show that provisions prohibiting the erection of billboards within a certain distance of the street line have been held by some courts unreasonable and to be a taking of property without due process of law; but it should be noted here again that no billboard case cited has passed upon provisions like this section. In all of those cases, the provisions absolutely prohibit the erection of billboards—safe or unsafe—within certain fixed distances from the street or building line. This is obviously far more drastic than are the provisions here under consideration. The provisions in those cases do not admit of the erection of absolutely safe advertising structures within the prescribed space; the provision here carefully avoids this difficulty and does permit the erection within the prescribed space of what the legislature deems safe structures. Furthermore, of the eight billboard cases which passed upon these far more drastic provisions, five held them unreasonable and bad, and three upheld them as valid exercise of the police power. The cases which hold such a provision bad are not decisive of the reasonableness of the provisions of Section 6, because they strike down provisions far more stringent and drastic; the cases that hold such a provision good *a fortiori* are direct authority for the validity of this provision; as they uphold a far more drastic regulation, they certainly would uphold a far less one. The cases that hold such a provision bad as being too broad, are: *Crawford* v. *City of Topeka*, 51 Kan. 756, 761; *Chicago* v. *Gunning System*, 214 Ill. 628, 640; *Passaic* v. *Paterson B. P. Co.*, 72 N. J. L. 285; *State* v. *Whitlock*, 149 N. C., 542, 544; *Curran Co.* v. *Denver*, 47 Colo. 221. All of these five cases expressly say that the state can regulate or prohibit the construction and maintenance of unsafe structures; and that is what Section 6 of the ordinance at bar aims to do. It is in effect not prohibitive, but merely regulatory, and simply requires as to

such structures built on or near the street line different and more durable supports.

The cases that hold such a provision good are: *St. Louis Gunning Co.* v. *St. Louis*, 235 Mo. 99; *Ex Parte Savage*, 141 S. W. (Tex.) 244; *Kansas City Gunning Co.* v. *Kansas City*, 144 S. W. 1099 (Mo.)

Section 6 also limits the height of all outdoor advertising structures properly attached to the ground to nine and one-half feet, and the over-all height, including supports, to eleven and one-half feet; it limits the length to thirty-six feet; and requires a two-foot open space under the board and between any two billboards. Here, also we find that it is not unreasonable for efficient regulation to limit the over-all height of such structures to eleven and one-half feet and the length to thirty-six feet. A limit must be fixed somewhere, and the law making body in its wisdom has fixed it at the point mentioned.

The ordinances in many of the adjudicated billboard cases limit the size and areas of the structures, although not differentiating the size of structures erected on roofs and the size of those erected upon the ground, but the principle is the same in both cases; if the billboard situation is to be at all properly handled there must be some limitations put upon the size of all such structures. And even *Curran Co.* v. *Denver, supra,* which holds the ordinance there bad because it prohibited all billboards, safe or unsafe, within a specified distance from the street, admits that some limit is proper; the only qualification is that it be reasonable.

What is a reasonable height or length or area is not easy to decide. The language of the court *In re Wilshire,* 103 Fed. 620, where an ordinance which limited the height of all advertising structures to six feet was upheld, is quite appropriate here. The court on p. 624 says: "It must be admitted that the limit prescribed approaches very closely, if it does not reach, the point of unreasonableness. But between the line above which the height prescribed would be obviously reasonable, and below which it would be obviously

unreasonable, there is a range concerning which reasonable and fair minded men may well differ.  The action of the municipal authorities, exercised within that range, ought not, in my opinion, to be interfered with by the courts."

. . .

"I entertain a good deal of doubt in respect to the reasonableness of the maximum limitation placed upon the structures in question by the municipal authorities of the city of Los Angeles,  but the fact that this doubt exists is sufficient reason for the court to decline to adjudge the ordinance invalid.  It is only in clear cases that such a judgment should be given." . . .

"In a very recent case before Judge Rhodes of the Superior Court of Santa Clara County, Cal., that learned judge declined to interfere with an ordinance fixing 10 feet as a maximum height for the erection of such structures, saying, in his opinion:  'In this case, if the prohibition were against a height above 50 feet, there could be no question of its validity, any more than there would be in the other cases given as to the height of houses.  If they were limited to only 2 feet, it would be equally clear that it would be unreasonable.  Now, between those points there is a reasonable limit. The authorities that have passed the ordinance have said that, in their opinion, 10 feet is not an unreasonable limit. Can the court take upon itself to say that it is unreasonable? If they had said 15 feet, I do not think there could be any question about its validity.  If they had said 8 feet, or 9 feet, or 10 feet, or 12 feet, it is very difficult to find any point where the court could intervene, and hold that the limitation of the height is not reasonable.   I do not think that the court can declare that 10 feet is unreasonable.'"   (The quoted case in unreported.)

(4)   The court is of opinion that in view of the need of some such limitation on size as here, and in view of the fact that the lawmaking body has far more opportunity to ascertain and meet the public need than the court can have, and in view of the wide latitude permitted the legislative branch in

determining the public needs and the appropriate remedies, the court should uphold the limitations on size imposed by this section, which in our opinion are not clearly unreasonable.

The final provision of this section, requiring a two-foot space underneath, is reasonable, especially in view of the fire dangers and the moral dangers incurred in case the structures are extended to the ground, both of which are fully set forth in the *St. Louis Gunning* case, hereafter referred to at length.

There is no case denying the reasonableness of such provisions. On the other hand, five cases have either a similar provision or one requiring even a higher underneath open space; four of the ordinances containing such a provision are upheld; one is struck down, going off on another point. These cases are *St. Louis Gunning Co.* v. *St. Louis; Ex Parte Savage; Kansas City Gunning Co.* v. *Kansas City and Chicago Gunning System,* all *supra,* and *State* v. *Staples,* 73 S. E. 112 (N. C.).

We find that both upon reason and authority the provisions of Section 6 are reasonable and valid.

Section 7 merely permits every such structure to have attached to its top a further strip or board, not to be over six feet long and six inches high, to be used only for the owner's name and place of business.

There is nothing whatever unreasonable about this.

Section 8 requires that every structure and billboard for outdoor advertising be safely and substantially constructed, fastened and secured, and when reasonably necessary, to be anchored or braced, or both; and especially so when on or over the roof of any building. It requires further that all apparatus for electrical illumination of the structure shall be in accordance with the regulations of the Insurance Association of Providence, and that no such structure, any part of which is made of wood, shall have any attachments for electrical or other illumination of the same.

These provisions certainly are not unreasonable and are adapted to promote public safety.

The latter part of this section dealing with illuminated signs speaks for itself. Such signs are in vogue; they are rapidly increasing in number. The provision that no such structure shall be made of wood simply recognizes and tries to avoid the fire danger. When it is remembered that these structures are generally built and placed in isolated and inaccessible spots, and that they are illuminated chiefly during that very period when supervision is at a minimum, viz.: in the night-time, some regulations certainly seem necessary; and in view of these potential dangers, to require them to be made entirely of some other material than wood is not unreasonable. It certainly reduces the fire hazard. The further requirement in this section that all apparatus for the electrical illumination of any advertising structure shall be in accordance with the regulations of the Insurance Association of Providence is also reasonable fire precaution. Electrical devices are dangerous; winds and the elements may easily dislodge the wiring and cause the wearing away of the insulation; to allow such devices to be put on structures similar to the aforementioned without any adequate supervision would be to invite fire danger. The requirement here cannot be said to be unreasonable.

Section 9 requires that all billboard structures for outdoor advertising shall be kept in safe repair; it provides further for the making safe, or the removal by the owner or other person interested therein, of any such board that is or becomes dangerous to the public in any way, and especially if dangerous in case of fire.

The manifest purpose of these requirements is reasonable; they are aimed to secure the maintenance of only safe structures. There is nothing in any of the adjudicated billboard cases that would warrant the court in striking down the provisions of this section.

Section 10 provides that no such structures for out-door advertising shall be erected, constructed, relocated, rebuilt,

altered, changed or materially repaired unless the plans, and specifications of the billboard and any new location thereof be approved by the inspector of buildings.

The obvious purpose of this section is to keep the billboard situation under the supervision of some public official, to aid those intending to comply with the law and to enforce the law against any disposed to violate it. The cases are numerous upholding the principle that certain activities must secure the approval of certain public officials, and the billboard industry is no exception to this rule. Several cases uphold ordinances prohibiting billboards over certain heights without the consent of designated bodies or officials. These cases are: *Rochester* v. *West*, 164 N. Y. 510; *Gunning System* v. *Buffalo, supra; Whitmier & Filbrick Co.* v. *Buffalo*, 118 Fed. 773; *Curran Co.* v. *Denver, supra; People* v. *Hastings, supra.*

Although the language of the provisions in these cases is not exactly similar to ours, the principle is the same. No court has struck down such provisions and its provisions seem to us to be entirely reasonable.

Section 11 prohibits the display of immoral or indecent matter or depiction of crime upon such structures and requires the written approval of the board of police commissioners of all matters displayed.

Argument here is superfluous. The aim of the provision is the moral welfare. Such structures uncensored might easily become a most dangerous menace to the community. No case has denied the validity of such a provision; several expressly concede the right to prohibit immoral or indecent displays.

Section 12 prohibits the display of any outdoor advertising on any estates or buildings owned or controlled by the city, or on any tree, post, pole or city property within the occupation line of any street.

(5)    There is no taking of private property without due process here; the city may well do what it will with its own. It has full power to prohibit advertisement on trees, posts and poles,

in streets.   No argument is needed to show the validity or reason of such a provision; no court has held a similar one invalid.

The three final sections supplement the preceding ones. Section 13 provides a fine for violation; Section 14 provides for the removal of said structures after conviction for the violation of this ordinance.   The contents of these sections are certainly adapted, if not necessary, to a proper and efficient control of the advertising industry.   And Section 15 provides that each provision and every regulation is intended to be separable, and that if any part of a provision or restriction should be held invalid because of unreasonableness, such fact should not affect the validity of any other provision.

Upon this careful and minute survey of the ordinance in question, and a careful comparison of the same with the provisions of the enabling act, we are fully satisfied that it is in all respects strictly within the powers conferred by the General Assembly upon the City Council of the city of Providence; that it is not unreasonable in any of its provisions; that it does not set up any unfair classification or discrimination against the defendant, and that it is strictly and clearly an exercise of the police power, as it purports to be, "in order to preserve and promote the public safety, health, morals, comfort and general welfare."

Defendant's counsel having started with the erroneous view that the ordinance here in question has no relation to the preservation of public safety, etc., have cited a number of billboard cases where the ordinances under consideration were held to have no such relation, and to be unreasonable and void.   Thus in *The Haller Sign Works* v. *The Physical Culture Training School*, 249 Ill. 436, an act of the legislature made it unlawful to erect a structure for displaying advertising signs within 500 feet of a public park or boulevard.

The court, while recognizing the general police power to properly regulate and restrain the use of private property for the preservation of the public health, comfort, safety and

welfare, held that the act in question, being a general pro-
hibition of a lawful use which was not itself injurious, was an
unreasonable attempt to limit the proper use of private
property and was therefore unconstitutional and void.

In *Curran Bill Posting and Distributing Co.* v. *City of
Denver*, 47 Colo. 221, an ordinance prohibited the erection or
maintenance of a billboard without a permit; prohibited
erecting a structure for advertising display within 10 feet of
street line, or more than twenty-five feet in length or more
than eight feet in height; and also provided that no person
should erect a structure for the display of advertising without
a license issued upon the written consent of the adjoining lot
owners and residents directly opposite such proposed bill-
board.   The ordinance made no provision or restriction as to
whether the board was to be of combustible material or safe
or sanitary or otherwise, or any prohibition whatever, when
the structure was not used for advertising purposes; and was
properly held to be unreasonable and void.

Speaking of the reasonableness of the provisions requiring
boards to be set in ten feet from the street, the court on p. 228
said:   "Wherein is the reasonableness or necessity for such
restrictions to protect the public health, the public morals,
or the public safety?   The restrictions are not limited to
structures made of wood or combustible materials.   More-
over, it will be observed that structures of whatsoever
material, strength, height, or length, erected on the street
line, do not come within the prohibition of the ordinance, if
they be not designed or used for advertising purposes.   The
restrictions imposed are not against the material, the height,
the length, nor the location of the structure, but solely as a
means of advertisement.   It prohibits such structures with-
out regard to their being safe or sanitary.   Though they be
perfectly safe, thoroughly sanitary, not made of inflammable
material, nor a menace to the public, nor to individuals,
they are nevertheless, under this ordinance, prohibited, and
for the sole reason that they are structures designed to be
used for advertising purposes.   In what way can the erection

of safe structures, of proper material, within certain limits, for advertising purposes, endanger the public health or safety any more than like structures erected and used for other lawful purposes.    If the owner has the right to erect upon the lot line buildings or other structures of proper material, in a substantial manner, as he undoubtedly has, it is certainly an unwarranted invasion of his rights to prohibit the erection or use of such structures for proper advertising purposes.''

The court on p. 230 admits the power to regulate insecure and unsafe advertising structures.    It says:  ''The city by virtue of the grant of power in its charter has the unquestioned right to prescribe the manner of construction, and to compel the use of incombustible material in the erection, of signs and billboards within certain limits reasonably necessary to prevent the spread of fire, and within like limits to restrict their size; to prohibit the erection of insecure billboards or other structures; to require the owners to maintain them in a secure and sanitary condition; to provide for their removal at the expense of the owners in case they become dangerous or unsanitary, and to prohibit advertisements thereon of indecent or immoral tendencies.    It may also have the power to reasonably limit the length, the height and locations of billboards or structures made of such materials, and erected in such manner as may likely be dangerous to the public by falling or being blown down.''

Again in *Varney & Greene* v. *Williams*, 155 Cal. 318, where an ordinance of the town of East San José, California, which absolutely prohibited the erection or maintenance of any billboard, was held invalid as depriving the owner of his property without compensation, the court nevertheless held that an ordinance prohibiting advertisements of indecent or immoral tendencies, or signs dangerous to the physical safety of the person or property of the public was within the police power.

Defendant's counsel also cite a number of other cases where ordinances have been held void of which the above quoted cases are fair examples, and therefore an extended

review of them is unnecessary and would unduly extend this opinion. *Cleveland* v. *Giese, Police Court* (no report cited); *Bryan* v. *Chester*, 212 Pa. St. 259; *Cleveland* v. *Bryan*, 8 Ohio, N. P. 552; *People* v. *Murphy*, 195 N. Y. 126; *People* v. *Hastings*, 137 N. Y. S. 186; *Com.* v. *Boston Advertising Co.*, 188 Mass. 348; *State* v. *Whitlock*, 149 N. C. 542; *Crawford* v. *Topeka*, 51 Kan. 756; *Bill Posting Sign Co.* v. *Atlantic City*, 71 N. J. L. 72; *Passaic* v. *Paterson B. P. Co.*, 72 N. J. L. 285.

In all of these cases it was found that the ordinances or statutes considered were too broad and prohibitive in their character, and that they had no real relation to the preservation of the public safety, health, morals, and general welfare, but were obviously governed in most instances by mere æsthetic considerations. None of these cases have considered any ordinance or law, in any respect similar in its limitations to that here under consideration; and we find nothing in any of the cases cited which in any way disturbs our findings above expressed in regard to the reasonableness of the provisions of the ordinance which is here in question. On the contrary all of the cases above referred to, while condemning the ordinances which they had to consider, agree in the broad general principles regarding the exercise of the police power as applied to billboards as set forth in the quotations above given.

Counsel for the prosecution have set forth in a most able and elaborate brief a vast number of cases bearing upon all of the direct and most of the collateral questions which might be discussed. It will not be necessary, in fact it would be impossible, to discuss and review them all, within reasonable limits, in this opinion. We are fortunate, however, in finding a few leading cases which ably discuss and dispose of most of the direct points raised.

The case of *St. Louis Gunning Co.* v. *St. Louis*, 235 Mo. 99, decided, June 7, 1911, is the most fully and elaborately considered of all the billboard cases, and is to be regarded as a leading case. The ordinance sustained in that case was in many respects more severe and prohibitive in its regula-

tions than the one here under consideration; in general terms the St. Louis ordinance prohibited billboards and advertising structures over fourteen feet high; limited their area to five hundred square feet; required a four-foot open space beneath, and prohibited their location nearer than fifteen feet to the street line and six feet to any building or side line of lot; required also a two-foot space between billboards.

The city circuit court found that the special billboards which had violated this ordinance were not unsafe and were not conducive to nuisance or immorality, etc., and held the ordinance void.

This was an appeal to the Supreme Court of Missouri, which held (1) that the city had power to enact the ordinance; (2) that the billboards are a proper class for special regulation; (3) that the ordinance was not an unreasonable exercise of police power; (4) that such restriction and regulation of the use of private property did not amount to a taking of private property for public use without compensation, nor to a deprivation of property without due process of law, or contrary to the law of the land, or to a denial to the owner of the equal protection of the laws, and was not in violation of any of the provisions of either the constitution of the United States or of the constitution of the state.   In reference to the propriety of classifying billboard structures as the subject of special provisions, in distinction from other buildings and structures, and speaking of the quality and construction of billboards and advertising structures, the court on p. 144, says: "These billboards are temporary affairs, consisting of upright timbers, or posts, set in the ground at various distances from each other, braced from the rear, with stringers running from one to the other and there secured by means of nails or bolts.   These stringers are then covered with boards standing on ends and nailed thereto, and thereby presenting a smooth vertical surface upon which the various announcements are made or displayed."   Again on p. 192: "As a rule, billboards are erected upon ground temporarily vacant, generally upon property which is being offered for

sale, or while the owners are preparing to build thereon; or where the property belongs to some estate which is in litigation, or for some similar reason the property is only temporarily vacant.   In all such cases, when the property is sold, the lot is built upon, the litigation settled or the estate is partitioned, the billboard thereon generally must go.   For this reason, billboards must also be temporary structures, cheaply built, and more or less insecure on that account. The same is true of house signs and sky signs, probably in a less degree, however, than in cases of billboards.   The leases for all those purposes must in the very nature of the business be of short duration, as compared to the duration of leases for all other classes of buildings.   And it should be borne in mind that the Municipal Assembly enacted this ordinance to control and regulate these structures as they really are, and not as if they were constructed as other buildings are."

Speaking of their peculiar shape and construction, the court at the bottom of p. 174 says:   "It must be remembered that there are thousands of these billboards in the city, and they are in the very nature of things temporary structures, generally consisting of one frail narrow line of boards nailed to upright posts set in the ground, and cheaply constructed. They are not like ordinary buildings, with at least four outer walls, covered over, and every part holding, bracing and weighting down every other part thereof.   Before such a building can be blown down, the walls thereof must be crushed in, which are supported and braced by each other, or the entire building must be turned over, which would require a wind strong enough to lift the roof and three sides thereof sufficiently high from the ground to turn it over.   Common experience teaches us that nothing short of a tornado will do either.   But not so in the case of a billboard.   There are no walls or roof to support and strengthen it, nothing but the braces in the rear thereof to lend them support, and they, as a rule, are the boards themselves.   Most of them are so constructed that their bodies are wings wide spread like the sails of a great vessel and they gather the winds, and if not

properly and securely constructed, they will more than likely be blown down when the first high wind strikes them, and inflict injury upon those who are upon the streets.''

Speaking of the moral dangers from billboards as a class, the court on p. 145 says: ''The evidence shows and common observation teaches us that the ground in the rear thereof is being constantly used as privies and the dumping grounds for all kinds of waste and deleterious matters, and thereby creating public nuisances and jeopardizing public health; the evidence also shows that behind these obstructions the lowest form of prostitution and other acts of immorality are frequently carried on, almost under public gaze; they offer shelter and concealment for the criminal while lying in wait for his victim; and last, but not least, they obstruct the light, sunshine and air, which are so conducive to health and comfort.''  Again on p. 175: ''Not only that, but if they are not constructed according to reasonable regulations, then in the very nature of things, as before shown, they become the evil wing which shelters, incubates and gives life and being to the nuisances before mentioned.''

Speaking of the peculiar fire dangers springing from billboards, the court on p. 153 says: ''Not only this, but the record also shows that the ground in the rear of all such billboards is thereby practically converted into and is constantly being used as privies and general dumping grounds for all kinds of rubbish and filth.  The grass and weeds which grow back of these billboards cannot be cut or destroyed on account of the posts and braces extending back from the rear thereof.  And these billboards, like snow sheds, cause a suction behind them, and when the wind blows against their fronts it gathers up papers and all kinds of trash and combustible material and deposits them in the rear thereof, which are securely retained there by the growing grass and weeds, until the fall of the year, when the frost and cold kills the grass and weeds, which in the course of a little time become dry and highly combustible.  Under that condition we see hundreds, and perhaps thousands, of these billboards, with

their solid walls and rear supports, extending from a few feet up to twenty-five or thirty feet in height, and possibly more, composed of boards and timbers, dry as tinder, covered with paint and paper posters, and packed in behind with dry grass, weeds, paper and other combustible materials, which have been growing and accumulating for months, thereby creating hundreds of menacing conditions throughout the city, which may at any moment be ignited by a spark from a near-by chimney, a lighted match in the hands of some thoughtless child, or by a stump of a burning cigar, tossed aside by some careless hand. It will be readily seen that a fire thus started would grow and spread in no mean proportions; and, in case of high wind, the results thereof might, in all probability, result very seriously in destruction of property and disastrously to human life.''

The court (pp. 181 *et seq*) reviews at great length the case of *People ex rel.* v. *Murphy*, 195 N. Y. 126 (a case much relied upon by defendant here) which related to a building ordinance of the city of New York, relating exclusively to ''sky signs,'' which ordinance was held invalid by the New York court of appeals, because it was prohibitive and had no relation to public safety, etc., and because it was not a proper classification, and was therefore unreasonable and in violation of constitutional rights; and after setting out the main parts of the case, the Missouri Court concludes its remarks thereon as follows (p. 189): ''While I recognize the fact that the court which delivered that opinion is one of the greatest and strongest courts in the world, yet with all due respect and deference thereto, in my opinion, it is unsound in several particulars.

''The first criticism I have to offer thereto regards that part which holds, in substance, that the object of the ordinance was not to prohibit the erection of any such sign over and above any wall or building, but the thing condemned thereby was 'the letter, word, model, sign, devise or representation in the nature of an advertisement, announcement or direction painted or posted thereon or attached thereto.'

"As I read the ordinance, as set out by the court, there is no language contained therein which warrants or supports the construction placed upon it by that court. And, clearly, the reason which prompted the Municipal Assembly to limit the application of the ordinance to house signs, sky signs, etc., was because there is no other class or character of structures attached to the walls of buildings or erected upon the roofs thereof, except those which are used for advertising purposes. So, while the lawmakers, by using the language contained in that ordinance, technically limited its application to a special class of structures, viz.: boards upon which advertisements are painted or pasted: yet, in truth and in fact, the ordinance is not special and limited in its operation, but it embraces every structure which is erected in the city of the character mentioned, for the very good reason, as before stated, that there are no other such structures erected and used for any other purpose than those named in the ordinance.

"It is true, the court in the New York case mentions in this connection, 'tanks, towers, chimneys, flag poles, balustrades and finials,' yet we will presently undertake to point out and show that they have no connection whatever with billboards, house signs or sky signs, and that they do not belong to the same general class of structures to which the latter belong, either in character, durability, strength or safety, and that the same nuisances cannot flow from them that are incident to the former class of structures, when erected upon the ground."

Again on p. 192 (speaking of classification) the court says: "The fact that said ordinance does not embrace within its provisions, nor limit the height of tanks, towers, chimneys, flag poles, balustrades, finials or other structures, useful or ornamental, should not, in our opinion, condemn the same, for the reason that they do not belong to the same natural and general class of subjects to which house signs, sky signs and billboards belong. The latter belong exclusively to a class of their own, on account of their character,

structure and inherent weakness, and on account of their temporary character they must be cheaply and insecurely constructed. Should they be required to be constructed with the same permanency, strength and security with which ordinary buildings are constructed, then that fact alone would destroy their commercial value and put them out of business, for the cost of construction would greatly exceed the amount of the income that would be drived therefrom."

Again on p. 193: "If not for the reasons before stated, then for some other reason house signs, sky signs and billboards over six feet or eight feet in height are not as strongly built as are tanks, towers, chimneys, etc. The latter are hollow and are supported by four walls or timbers, which support and brace each other, thereby greatly increasing their strength and security over a billboard, a narrow straight wall extending high into the air and supported only by rear braces. The strength of the former and the comparative weakness of the latter are shown by a bar of steel. For instance, a bar of steel an inch in thickness and six inches in width, or six feet for that matter, ten feet in height, would not, I dare say, more than support its own weight should it be raised to a vertical position; but if you should take the same bar and bend it in the center the entire length thereof to a right angle so as to form a bar known as an 'angle iron,' and then raise it to the same position before mentioned, it would then not only support its own weight, but it would support many times that weight; and upon the same principle, if you should take the same bar of steel and form out of it a hollow square or tube, then you would again increase its strength many times over what it would be if left in the shape of angle iron. For instance, take a case which came under my personal observation, in fact I was one of three who constituted a committee, which had under its charge the construction of a self-supporting steel chimney, in a section of the country proverbial for its high winds, one hundred and twenty-five feet in height. The steel consisted of plates one-half inch in thickness and of various dimensions. They were so riveted

together as to form a tube about ten feet in diameter at the
base and about six feet at the top.   The chimney was firmly
anchored to a solid concrete base, and was required to be of
sufficient strength to withstand wind storms of such force
and violence as would cause the top of the chimney to
oscillate about three and one-half feet beyond a perpendicular
line."   .   .   .   "By forming this steel into a tubular stack
or chimney, it was made sufficiently strong to withstand the
force of the strongest wind storms known to that section,
which is saying a great deal.   Now, suppose we should
sever the tube on one side from the top to the base and open
it out so as to form a straight vertical wall one hundred and
twenty-five feet in height, thirty feet wide at the base and
gradually narrowing to a width of eighteen feet at the top,
with a thickness of only one-half inch.   We would then have
a structure similar to billboards, house signs and sky signs,
except as to rear supports; but with the supports added,
could it then be seriously contended that such wall would
belong to the same class of structures to which chimneys,
tanks and towers belong, as it was held to be by the court of
appeals of New York in the case of *People ex rel* vs. *Murphy,
supra*?   We think not.   When the high winds of that
section would strike such a wall, if it was braced no more
securely in proportion than are plaintiff's billboards, etc., are
supported, it would not withstand that force one moment.
And the same is true of chimneys, tanks and towers the
four walls of each support one another, and are thereby
rendered many times stronger than any one wall thereof
would be if standing alone.

"If plaintiff should be required to construct its bill-
boards, house signs and sky signs as permanently, securely
and safely as chimneys, tanks and towers are constructed,
then there would never be another one of them constructed,
for the simple reason that the cost of the labor and materials
which would be required to so construct them would be so
great that they would not be remunerative."

Again on p. 195: "And as to flag poles and balustrades, they fall in neither of the above classes. The pole is strong and has no broad surface to catch and gather the high or strong winds, and the same is true of balustrades; it is open work and affords plenty of spaces through which the wind may pass almost unobstructed. While, upon the other hand, these house signs, sky signs, and billboards present a long, high, and solid surface against which the winds blow with all their unabated fury and force during storms and hurricanes. They must be built strong enough to withstand that force, or be blown down. There is no protection the wind can go around as is true in the case of a flag pole, or pass through the open spaces, as in the case of a balustrade.

"From these observations, it seems to me that the reasoning of the New York court" . . . "is unsound, in holding the ordinance there under consideration invalid because it was class legislation, in that it did not include within its provisions chimneys, towers and tanks."

As to the difference between fences and billboards the court on p. 154 says: "In answer to these suggestions counsel for plaintiff argues that the same nuisances might be committed behind fences and in buildings. While that is possible, yet it is not probable; nor does the erecting and maintenance of a building or a fence along the lines of private property bordering upon public streets have the natural tendency to create any such nuisances as those mentioned. Buildings and fences are erected for the purpose of enclosing grounds and excluding therefrom strangers and trespassers; and common experience teaches us that they are effectual for that purpose, which is inconsistent with the idea that they promote and harbor nuisances as billboards do, which rarely, if ever, enclose the grounds upon which they stand. That is not the purpose of their erection."

As to the validity of billboards as a special class the court at the bottom of p. 201 says: "We are also of the opinion that those cases which hold such ordinances to be void because they were class legislation are also unsound, for the

reasons before stated, that billboards, house signs, and sky signs belong to a class unto themselves, and when they alone are named in an ordinance, there are no other structures of similar character to be found in the city which could be reasonably included with them. While, as before stated, persons could build similar structures and not use them for advertising purposes, yet it is sufficient to say that they have not as yet done so, and in all probability they will never do so, as we are unable to conceive any other use to which they could be adapted; but, be that as it may, we will not decide that question until such a case is presented to this court for determination."

Speaking of adjudicated billboard cases, all of which we carefully reviewed, the court on p. 200 says: "While the authorities are conflicting upon some of the questions presented and discussed, yet it may be fairly said that all of them agree upon the following legal propositions:

"First. That municipal corporations, even under their general police powers, may, by ordinance exercise reasonable control over the construction and maintenance of billboards, house signs and sky signs.

"Second. That said power to regulate said matters begins where the public safety, health or morals and good government demand such regulation, and ends where those public interests are not beneficially served thereby.

"And third. That the mere unsightliness of billboards and of similar structures, as well as their failure to conform to aesthetics, is no valid reason for their total or partial suppression.

"But the division of the courts, as is often the case, was brought about in the application of those rules of law to the facts of concrete cases. Some of them were of the opinion that the ordinance as applied to a particular case was unreasonable, or was not necessary for the public safety, etc., in that particular case; while other courts were of the opinion that similar ordinances, equally drastic were reasonable and necessary.

"In our opinion, the latter cases are based upon more solid ground and are supported by better reason, though not by the greater weight of authority, if we determine weight by the number of adjudications, upon that subject.

"By reading the cases which held the ordinances invalid, it will be observed that they either fail to give any reason whatever for so holding, but contented themselves by simply stating that they were unreasonable and unnecessary, and, therefore, they were violative of both the State and Federal Constitutions." . . . "Or, when they assigned a reason for holding the ordinance void, the reason stated was either that the ordinance was class legislation and did not embrace all structures in the city of similar character, as was especially true in the case of *Bryan* v. *Chester, supra,* or that the ordinance upon its face disclosed the fact that it was enacted solely for æsthetic purposes, and not for the good of the city.

"In our opinion, that class of cases which hold the ordinances invalid, without assigning any reason for saying that they were unnecessary or unreasonable, are entitled to but little weight in the considerations of such questions, for the reason that, in our judgment, they invade the legislative domain of the State, which is prohibited by the Constitution, and for the further reason that the courts, as a rule, are not as good judges of the necessity for or reasonableness of laws as are the lawmakers, who are elected by the people themselves. It is the opinion of most publicists that the administration of the law does not afford to those engaged therein the same advantages and broad opportunities to judge of the necessity, wisdom and reasonableness of laws as do the experience of the people, who live under those laws, which are but the reflection of their wishes regarding the various matters covered thereby."

Again on p. 202: "As to the third class of cases, that is, those which hold such ordinances invalid because they show upon their faces that they were enacted solely for æsthetic considerations and not for the good of the public, they are unquestionably sound; and no court should uphold

an ordinance which has no better reason than that to commend it to the lawmaker and the courts.   If the necessity or reasonableness of such an ordinance should be tested by such a standard, then the standard itself would be hard to establish, for the reason that all do not have the same tastes or ideas of beauty; what would please one might not please another.   In fact, tastes and ideas of beauty are as varied as are the leaves upon the tree, no two are alike and thousands are dissimilar.   A statute or ordinance conforming to the tastes and ideas of beauty passed by the body of lawmakers who enacted it, might, and probably would in most instances be distasteful to a majority of the people of the city; and especially is that true as regards this class of legislation. The matters which would most likely be the subjects to this class of legislation are, as a rule, more pleasing to those who are far removed therefrom than they are to those who reside near them and who are subjected to their annoyance and inconvenience.   In all such cases, distance lends enchantment to the view; also softens and adds sweetness to the rhythmic sounds of industrial bells, as well as dissipates the noxious gases and offensive odors incident to such institutions.   Property rights should never be subjected to such fickle standards of regulation, especially when they are devoid of all substantial benefits to the citizens."

And finally, on p. 203: "There is another class of cases which, in our opinion, announced the correct rule as regards the reasonableness and unreasonableness of this class of ordinances.   That rule is, that all ordinances must be held valid by the courts except, first, where the unreasonableness appears upon the face of the ordinance itself; and, second, where the evidence introduced clearly shows that the ordinance is in fact unreasonable."   .   .   .   "In the case at bar there is nothing appearing upon the face of the ordinance under consideration which shows that it is unreasonable, nor does the evidence introduced at the trial of the cause tend to show that it was unreasonable; but upon the contrary, the face of the ordinance itself, as well as the evidence *aliunde,*

clearly shows that the ordinance was not only reasonable in its provisions, but that it was highly necessary to protect public safety, health, morals and well-being of the city."

The dissenting opinion of GRAVES, J., states his belief that the prohibitions of the ordinances are unreasonable, particularly in the requirement that all such structures must be fifteen feet from the lot line without regard to the character of the structure, and amount to a confiscation of private property; and that the ordinance is not in the interest of public health, safety, morals or general welfare, but is solely related to æsthetic tastes and purposes. It is enough to say in relation to this dissenting opinion, that the provisions of the St. Louis ordinance which led Judge Graves to condemn it are more stringent and prohibitive than any provisions of the ordinance in the case at bar, which is carefully guarded in all these particulars, as shown above. This case was taken on writ of error to the Supreme Court of the United States, but was "dismissed per stipulation" without consideration by that court; see 231 U. S. 761.

We have set forth the case of *St. Louis Gunning &c. Co.* v. *St. Louis,* at such length because it is a very late case and because it is the only case cited to us where up to 1911 the whole subject of billboard regulation has been fully, carefully and adequately considered. The Supreme Court of Missouri, again in 1912, in the case of *Kansas City Gunning Co.* v. *Kansas City,* 144 S. W. 1099, considered and sustained an ordinance of Kansas City, Missouri, quite similar (except in one section which was admitted and held to be void) to the St. Louis ordinance, and approves and follows the case of *St. Louis Gunning Co.* v. *St. Louis, supra,* GRAVES, J., dissenting, as in that case and for the same reasons.

The alleged violated sections of the state and federal constitutions referred to in the first three grounds of the motion to quash, contain provisions as follows: Sec. 10 of Art. 1 of the R. I. Constitution: "nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land." 14th Amend. to U. S. Con-

stitution, § 1: "nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Sec. 16 of Art. I of the R. I. Constitution: "Private property shall not be taken for public uses, without just compensation."

It has been repeatedly held by this court that the general phrases "due process of law," and "law of the land" mean the same thing. This court has spoken on this point in *State v. Beswick,* 13 R. I. 211. DURFEE, C. J., speaking of the phrase "law of the land" on p. 218, says: "This phrase has a historical origin. It was brought from *Magna Charta,* and, as has been repeatedly decided, means the same as 'due process of law.'" And defines "due process of law" as follows: "The definition of 'due process of law,' given by Judge Edwards in *Westervelt v. Gregg,* 12 N. Y. 202, 209, is quoted by Judge Cooley in his work on Constitutional Limitations,* p. 355, with approval, and is in our opinion, not only concise, but very accurate. 'Due process of law undoubtedly means,' he says, 'in the due course of legal proceedings according to those rules and forms which have been established for the protection of private rights.'" See also to the same effect: *Lowrey v. Mayor of Central Falls,* 23 R. I. 354, 357; *Gunn v. Union Railway Co.,* 23 R. I. 289, 301, 302; *State Board of Health v. Roy,* 22 R. I. 538, 545.

As we have already set forth, in considering in detail the provisions of the ordinance in question, we find that it is a reasonable exercise of the police power, under due and express authority from the General Assembly. And in view of the cases above set forth and of the other cases *infra,* we find that these reasonable regulations do not constitute a deprivation of property without "due process of law" or contrary to "the law of the land" or "without just compensation."

(6) The principles relating to the taking of private property without due process of law, and without just compensation are closely related, and may here be discussed together.

Reasonable regulations of the use of property under the police power do not constitute a "taking of property without due process of law." No compensation need be made for interference with the use of property caused by reasonable police regulations.

This principle is entirely different from the principle of taking property by right of eminent domain. That principle requires payment of compensation for an *actual taking* of property. But reasonable police regulations that interfere with the use of property are universally held to be not a "taking" of property at all, but simply a restraint on a noxious use that endangers the public welfare. The one *actually takes* private property and requires that compensation be made; the other regulates the use of that property in order to secure the public welfare.

No rule is better settled in the law than that the right to and the use of private property is not absolute. No man can do what he will with his own. His use of it is subject to the public welfare. The public welfare is preserved in part by the restraints upon the use of private property afforded by reasonable regulations under the police power,—that power often defined as the "power of self preservation in the state." Owners of private property are everywhere restricted by the maxim *sic utere tuo ut alienum non laedas.* The vast and increasing amount of police power regulation is based upon the recognition of this maxim. It is now settled beyond dispute that reasonable regulations of and restrictions upon the use of private property do not constitute a *taking of property* but constitute merely limitations upon its use, or, as some courts put it, "a salutary restraint upon a noxious use." The number of cases so holding is great; their authority is compelling. The citation of a few only will suffice, showing the recognition of this principle in this state.

In *State* v. *Paul*, 5 R. I. 185, 191, 193, AMES, C. J., says: "The argument here proceeds upon the false assumption, that rights of property are absolute and unqualified, and not restricted as they necessarily must be, by the greater right

of the community, to have them so exercised within it as to be compatible with its well-being." . . . "The right of the legislature to declare the sale, or use of property, in a certain mode, to be a nuisance, for the reasons which we have before considered, necessarily deprives the owner of the right so to sell or use it. Indeed, in such case, the right so to sell or use it ceases, in legal idea, to be a right of property; since no man can have a property in a nuisance.

In *Harrington* v. *Board of Aldermen*, 20 R. I. 233, which was an appeal from an order of the board of aldermen requiring appellant to connect her land in the city with the public sewer, and also requiring her to fill up and destroy all receptacles for drainage and sewerage on said land, ROGERS, J., on p. 237, says: "This statute, 'being in the interest of the public health of said city' . . . is clearly intended to be an exercise of what is called *the police power*, and if it is a proper exercise of such power, both as to subject-matter and as to methods, then its constitutionality cannot be successfully impugned." And see the numerous cases cited and reviewed in this opinion. See, also, *State* v. *Dalton*, 22 R. I. 77, 80; *Opinion of the Governor*, 24 R. I. 603, 605, and other cases cited *supra*.

We are therefore of the opinion that the provisions of the ordinance are in no way and to no extent in violation of either of the provisions of the constitution of the state or of the United States, above quoted.

The objections set forth in the "fourth" ground of objection only remain to be considered, viz:—"because Section 3 of said Chapter 542 and Section 11 of said ordinance, deprives the defendant of the right of judicial inquiry as to his vested rights, and vests an unjudicial officer and body with judicial powers in violation of Sections 14 and 15 of Article I and of Section 1 of Article X of the Constitution of the State of Rhode Island." The provisions of the state constitution above referred to are as follows:

Art. I. "Sec. 14. Every man being presumed innocent, until he is pronounced guilty by the law, no act of severity,

which is not necessary to secure an accused person shall be permitted."

Art. I.   "Sec. 15.   The right of trial by jury shall remain inviolate."

(7)   Art. X.   "Section 1.   The judicial power of this state shall be vested in one Supreme Court, and in such inferior courts as the general assembly may, from time to time, ordain and establish."

Defendant's counsel treat this subdivision by bold assertion of unconstitutionality, without argument, and refer only to one case, of a very different character, and having no special application.

Section 3 of the act, *supra*, permits the ordinance to provide that no outdoor advertising shall be displayed unless it shall be approved, as to all matters in Section 2 by a city or town officer, as being in conformity with such regulations, and it gives *the right of appeal to the town or city council.*

Section 11 of the ordinance, *supra*, prohibits the display, on any board put up for outdoor advertising, matters of an obscene, indecent, licentious or immoral character or depicting the commission of any crime.   In order to enforce this, it provides that all proposed advertising matters shall first have the written approval of the board of police commissioners as being in conformity with this regulation.

There is no contention here that the section of the ordinance exceeds the power given in the section of the act in question; the sole contention is that both the section of the act and the section of the ordinance violate the constitutional provisions.

Said section 11 of the ordinance gives the board of police commissioners power to decide whether or not the display contains matters of an immoral kind, or depicts the commission of a crime.   Obviously, unless said board gives its written approval, as being in conformity with the requirements of said section, the proposed advertising cannot be displayed.   In other words, the police board is given power to enforce the regulations of this section by withholding its

approval, and thereby preventing the display of such matters as it regards immoral; but it is also to be noted that this provision is subject to the right of appeal to the city council provided in Section 3 of the act.

The defendant contends that it is thus deprived of the right of judicial inquiry as to its vested rights, and that in conferring such a power on the board of police commissioners, judicial power is conferred upon an unjudicial body in violation of the above mentioned sections of the Rhode Island constitution.

At this point it is to be noted that the provisions of Art. I, Sec. 14, above quoted, have obviously no application to the matters here under discussion; no reference to this provision is made by defendant's counsel in argument or brief, and it appears to have been inserted by inadvertence or mistake.

The powers conferred upon the police commission, are not judicial powers under Art. X, Section 1, above quoted. This principle has been so often set forth in this state and elsewhere that the citation of many cases is not necessary.

See *Taylor* v. *Place*, 4 R. I. 324, and cases cited for the distinction between judicial powers in the sense of the constitution, and powers conferred upon executive and administrative bodies. See, also, *People* v. *Joyce*, 246 Ill. 124, 135; *De Camp* v. *Archibald*, 50 Ohio, St. 618, 625; *Cassidy, Petitioner*, 13 R. I. 143; *State Board* v. *Roy*, 22 R. I. 538, 542; *Blais* v. *Franklin*, 31 R. I. 95; *State* v. *Rosenkrans*, 30 R. I. 374, 385; *State* v. *Nelson*, 31 R. I. 264, 269.

The power thus granted does not violate Section 15 of Article I of the Rhode Island Constitution. That section reads: "The right to trial by jury shall remain inviolate." A long line of decisions in this state hold that this section simply guarantees the conservation, but not the extension of the right to jury trials in those cases only in which jury trials were given at the time of the adoption of the Rhode Island Constitution in 1843.

In *Merrill* v. *Bowler*, 20 R. I. 226, 228, DOUGLAS, J., says: "Art. I, Sec. 15, provides: 'The right of trial by jury shall

remain inviolate,'—which means simply that in those proceedings in which a right to trial by jury existed at the time of the adoption of the constitution the right shall still continue. 'The constitution requires simply the conservation, not an extension of the right of jury trial.'" This rule is recognized in the following cases: *Littlefield* v. *Peckham*, 1 R. I. 500, 506; *Crandall* v. *James et al.*, 6 R. I. 144, 148; *Mathews* v. *Tripp*, 12 R. I. 256; *Bishop* v. *Tripp*, 15 R. I. 466–469; *In re State House Commissioners*, 19 R. I. 326, 334; *The Narragansett Indians*, 20 R. I. 713, 765; *Mathewson* v. *Ham*, 21 R. I. 311, 314; *Shaw* v. *Silverstein*, 21 R. I. 500; *The Collection of the Poll-Tax*, 21 R. I. 582, 583; *State Board of Health* v. *Roy*, 22 R. I. 538, 544; *Gunn* v. *Union Railroad Co.*, 27 R. I. 322, 325; *Opinion in re Metropolitan Park Loan*, 34 R. I. 191, 197.

At the time of the adoption of the Rhode Island Constitution in 1843, not all controversies as to property rights were decided by jury trial. Property rights were often passed upon by some other judicial or non-judicial body. Here again we need look no further than to prior decisions of this court.

In *Crandall* v. *James, et al.*, 6 R. I. 144, 148, where the statute gave the school commissioner and a justice of the Supreme Court upon appeal power to decide as to the legality of a tax assessment, AMES, C. J., says: "Nor is this construction of the statute, as contended, liable to the objection that it creates a conflict between the statute and Section 5 (15), Art. I of the constitution, which declares, that 'the right of trial by jury shall remain inviolate.' The summary jurisdiction of visitors of academic bodies, nay, summary modes of passing upon the acts of officials engaged in the assessment and collection of taxes, were, at the adoption of the constitution, as well known in this state and in all other countries of the common law, as the equity, admiralty, and probate jurisdiction; and are as little liable as those, to the objection that they infringe the right of trial by jury. All these special jurisdictions have for ages, each in its

appropriate sphere and in its distinctive method, administered justice side by side with the common-law courts; and in so doing, have never been supposed to encroach upon the rights of trial appropriate to common law cases, as these rights have been understood and interpreted."

Counsel for defendant make no mention of this point in either brief or argument, and it is clearly untenable. Provisions similar in some respects, particularly where there was a right to appeal to the council were held valid, in *Rochester* v. *West*, 164 N. Y. 510; *Gunning System* v. *Buffalo*, 75 App. Div. (N. Y.) 31; *Whitmier* v. *Buffalo*, 118 Fed. 773. See also, *People* v. *Hastings*, 137 N. Y. Supp. 186; *New York* v. *Wineburgh Adv. Co.*, 122 App. Div. (N. Y.) 748; *Kobbe Co.* v. *New York*, 122 App. Div. (N. Y.) 755; *Ex Parte Savage*, 141 S. W. (Tex.) 244; *State* v. *Staples*, 73 S. E. (N. C.) 112.

Upon the whole case, both upon reason and authority, and after the most careful consideration, we are of the opinion that both the ordinance in question and the enabling act, are valid as a proper and reasonable exercise of the police power, and do not violate any of the constitutional provisions either of the Constitution of Rhode Island, or of the Constitution of the United States to which reference has been made.

The papers in the case will be sent back to the Superior Court, sitting in Providence, with our decision certified thereon, for further proceedings.

*Elisha C. Mowry, Assistant City Solicitor, Albert A. Baker, City Solicitor*, for complainant.

*J. Jerome Hahn*, for defendant.

*Gorman, Egan & Gorman*, of counsel.